**Richard S. FARR, as personal representative of the Estate of Sarah E. Farr, Plaintiff,**

v.

**SHEARSON LEHMAN HUTTON, INC., as successor in interest to E.F. Hutton & Company, Inc. and E.F. Hutton Group, Inc. and Hutton Energy Services II, Inc., Defendants.**

No. 89 Civ. 6806 (KC).

United States District Court, S.D. New York.

Jan. 21, 1991.

---

Lawrence Gelber, Beigel & Sandler, Ltd., New York City, Jim Ecklestein, Beigel & Sandler, Chicago, Ill., for plaintiff.

Brian F. McDonough, Shanley & Fisher, P.C., New York City, for defendants.

## ORDER

CONBOY, District Judge:

Plaintiff, Richard Farr ("Farr"), as personal representative for the estate of his mother, Sarah Farr, brings this action seeking damages for violations of federal security statutes and for state-law torts against Shearson Lehman Hutton, Inc., the successor in interest to E.F. Hutton & Company,

Inc.[1] This action centers on Sarah Farr's investment of $125,000 in two oil and gas limited partnerships, the Hutton/Indian Wells 1983 Energy Income Fund, Ltd. ("Indian Wells '83") and the Hutton/Indian Wells 1984 Energy Income Fund, Ltd. ("Indian Wells '84"). Farr claims that a broker employed by defendant recommended these investments to Mrs. Farr, with knowledge that they were unsuitable for her stated investment strategy, and that the Funds have performed very poorly, failing to return the initial investment. The Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, (Count One), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), (Count Two), and state common-law claims for fraud (Count Three), negligence (Count Four), and breach of fiduciary duty (Count Five). Because Sarah Farr was a citizen of Alaska,[2] and defendant is a citizen of New York, diversity jurisdiction exists as a separate jurisdictional basis for the state-law claims.

Defendant now moves for summary judgment contending that the written offering materials adequately disclosed all relevant risks of the investments, that there is no evidence of any oral misrepresentations made to Mrs. Farr, that there is no private cause of action under Section 17(a), and that the statute of limitations bars the Section 10(b) and the state law claims. Because we believe there is no private cause of action under Section 17(a) and because the statute of limitations bars the other claims, we grant defendant's motion.

### I. *Factual Background*

The following facts are not in dispute. Sarah Farr moved to Anchorage, Alaska in 1980. Defendant's Rule 3(g) Statement of Undisputed Material Facts ("3(g) Stmt.") ¶ 12. In 1981, she opened an account with Todd Gerber, an account executive in the Anchorage office of E.F. Hutton, Inc. In the Fall of 1983, Gerber recommended that Sarah Farr invest a portion of her portfolio in Indian Wells '83. Gerber Affid. ¶¶ 5, 6. At that time Mrs. Farr's portfolio was worth approximately $462,000, not including an earlier $100,000 investment in a limited partnership. Ex. E to Gerber Affid. On November 17, 1983 Sarah Farr purchased 100 units of Indian Wells '83 for a purchase price of $50,000. 3(g) Stmt. ¶ 1. Prior to making this investment, Mrs. Farr was provided with the Prospectus for Indian Wells '83. 3(g) Stmt. ¶ 2. She was also supplied with a January 1984 Supplement to the Indian Wells 1983 Prospectus in early 1984. 3(g) Stmt. ¶ 6.[3] In 1984, after receiving a letter from Indian Wells informing her of the creation of Indian Wells '84, Mrs. Farr contacted Gerber with

---

**1.** Defendant Shearson Lehman Hutton, Inc. is named as successor in interest to various Hutton entities. For purposes of this motion, distinction among the various Hutton entities is immaterial. This opinion shall refer to "defendant" or "Hutton" to refer to Shearson Lehman Hutton as successor to all the entities. Although plaintiff has used the word "defendants" in his caption of this action, there appears to be but one defendant.

**2.** 28 U.S.C. § 1332(c)(2):

"(c) For the purposes of this section and section 1441 of this title—
(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent."

Richard Farr is a citizen of Alabama.

**3.** According to the prospectuses and other written offering materials, Gerber Affid. Exs. A–D, Indian Wells '83 and '84 were limited partnerships for the purpose of buying proven oil and gas deposits. The oil and gas was to be extracted and sold, and the limited partners were to receive a quarterly distribution of income. Units sold for $500 each and the minimum investment was generally ten units. The general partners were Indian Wells and E.F. Hutton.

It is not disputed that Mrs. Farr's primary investment objective was income. Gerber has stated that he recommended Indian Wells '83 to Mrs. Farr as an inflation hedge: if rising oil and gas prices were to spur a period of high inflation, the municipal bonds which made up the bulk of Mrs. Farr's income producing assets would decline in value, but she would be pro-

an unsolicited order to invest in Indian Wells '84. 3(g) Stmt. ¶ 7. Mrs. Farr requested Gerber to invest $100,000 in Indian Wells '84. Gerber attempted to persuade her that she should not invest that large a sum in Indian Wells '84 and tried to convince her that she should invest no more than $50,000. Gerber Dep. at 145–148. Mrs. Farr agreed to purchase 150 units of Indian Wells '84 for $75,000, which she did on October 19, 1984. 3(g) Stmt. ¶ 9. Prior to investing in Indian Wells '84, Mrs. Farr received the prospectus for Indian Wells '84. 3(g) Stmt. ¶ 8.

Mrs. Farr died in May 1985, and Richard Farr was named the personal representative of her estate. 3(g) Stmt. ¶ 12; Farr Dep. at 17. Correspondence about the Indian Wells investments was forwarded to Farr at his home in Alabama, where it was received and read by Farr. Farr dep. at 67, 70, 82. Indian Wells '83 and '84 sent to its limited partners quarterly and annual reports, which Farr began receiving no later than May 8, 1986. Farr dep. 69–70, 78–80. These reports disclosed the amount of quarterly distribution, if any. *See* McDonough Affid. Exs. F, G, H, I, J, K. For Indian Wells '83 the distribution per $500 unit for the first quarter of 1986 was $7.76; for the second quarter there was no distribution; for the third quarter there was a net distribution of $1.20. Exs. F, G, H. In annual reports dated May 19, 1987, Exs. J and K, Indian Wells '83 and '84 listed the price at which they would buy back units from the limited partners, as provided in the prospectus. The buy-back (or "presentment") price, established by an independent appraiser, was $34.36 per $500.00 unit for Indian Wells '83, and $314.92 per $500 unit for Indian Wells '84. *Id.* The annual report also disclosed that total distributions through the end of 1986 for Indian Wells '83 had been $150.00, but distributions for 1986 had been only $12.34—a 2.46% annual distribution rate for 1986.

Farr received these reports, but did not read them in detail. Farr Dep. at 82.

Because of the correspondence from Indian Wells, Farr knew that the investments were not doing well, and he felt a continuing concern about the investments. Farr Dep. at 70–72. He made no inquiry of Gerber or anyone else however, until he received a letter from Beigel & Sandler, now his attorneys in this action, which had been sent out to purchasers of Indian Wells units, apparently informing them of the possibility of joining in litigation against the sellers of the units. Farr Dep. at 34–39, 70–73, 82–83. After receiving this letter, Farr contacted Gerber for advice on whether to join the litigation. Farr Dep. at 34–39. Farr requested from Gerber a copy of each prospectus, which he never received. Farr Dep. at 58–59. This action was filed on October 13, 1989.

The complaint sets out allegations that Gerber made certain fraudulent statements and omissions to Mrs. Farr at the time of her purchase of Indian Wells units. (*See* Cmpl't ¶ 24 at 6–7). Defendant in this motion for summary judgment contends that there is no factual basis for plaintiff's claim of misrepresentation, pointing to the deposition testimony of Mr. Farr (at 31, 47–54) which reveals that this complaint was filed before he had read it, and that Farr has no real basis for believing the specified statements were made. Plaintiff has tacitly conceded the point, and instead now promotes his claim as one for "unsuitability"—i.e. a claim that the Indian Wells investments were unsuitable for Mrs. Farr's investment needs, and that Gerber, knowing that they were unsuitable, recommended them to her anyway. We will address this action as one based on a claim of unsuitability.

## II. *Discussion*

### A. Section 17(a)

■ Defendant contends that no private right of action should be recognized under

---

tected because of her investment in oil and gas reserves through Indian Wells. Gerber Dep. at 96–98. Gerber states that he also explained to Mrs. Farr that, conversely, if oil and gas prices did not increase, or fell, her Indian Wells units would lose value, and she might lose money on them, but that if inflation stayed low, the rest of

her portfolio would perform well. Gerber Dep. at 96–98, 107–08. Although plaintiff disputes that this was Gerber's objective in recommending Indian Wells '83, Pltf.'s Response to Def.'s 3(g) Stmt. ¶ 3, he has come forward with no evidence to refute it, relying solely on speculation about Gerber's financial interests.

Section 17(a), 15 U.S.C. § 77q(a), and that plaintiff's second claim should therefore be dismissed. Plaintiff relies upon *Kirshner v. United States*, 603 F.2d 234 (2d Cir.1978) in contending the opposite. As we have previously held, we do not believe that there is a private right of action under Section 17(a). *Friedman v. Arizona World Nurseries*, 730 F.Supp. 521, 545 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir. 1991); *Tobias v. City National Bank and Trust Co.*, 709 F.Supp. 1266, 1274–76 (S.D. N.Y.1989). We see no reason to change that view at this time, and plaintiff's second claim is dismissed with prejudice.

### B. Statute of Limitations

#### 1. *"One Year/Three Year" Rule*

The Second Circuit has recently held that the uniform statute of limitations applicable to actions brought under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, is one year from the date of discovery of the claim, but in no event more than three years from the date of accrual (the "one year/three year" rule). *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2nd Cir.1990). Under the *Ceres* rule, plaintiff's Section 10(b) claim is clearly time-barred here. That claim accrued no later than November 17, 1983 with respect to the 1983 Fund, and October 19, 1984 with respect to the 1984 Fund, the dates on which Mrs. Farr purchased her limited partnership units. This action was filed on October 13, 1989, well over three years from both of those dates, and thus would be time-barred under the one-year/three-year rule.

■ The *Ceres* court expressly declined, however, to address the issue whether the rule should apply retroactively. 918 F.2d

at 364. It is quite possible that the rule announced in *Ceres* should not be applied retroactively in this action. The *Ceres* decision overruled the "consisten[t]" holding of the Second Circuit that the statute of limitations in Section 10(b) cases "should be adopted by reference to the pertinent laws of the forum state." 918 F.2d at 352–53. Where a decision applying a new statute of limitations overrules a "clearly established circuit precedent on which the complaining party was entitled to rely," and where retroactive application of the new limitations period would "be inconsistent with the purpose of the underlying substantive statute, and ... would be manifestly inequitable," the new limitations period should not be applied retroactively. *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 608–09, 107 S.Ct. 2022, 2025–26, 95 L.Ed.2d 582 (1987); *see also, Chevron Oil Co. v. Huson*, 404 U.S. 97, 105–109, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971); *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 241 (2d Cir. 1984) (where decision announcing new rule gives no indication whether new rule should be applied retroactively, *Chevron Oil* analysis is appropriate); *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1552–53 (3d Cir.1988) (en banc) (Seitz, J. dissenting) (under *Chevron Oil* analysis, newly announced federal limitations period for Section 10(b) actions should not be applied retroactively); *Finkel v. The Stratton Corp.*, 754 F.Supp. 318 (S.D.N.Y. 1990) (declining to apply *Ceres* retroactively to defendants who relied upon state limitations period).

■ We need not definitively resolve the retroactivity issue, however,[4] because even under the pre-*Ceres* rule, plaintiff's Section 10(b) claim is time-barred.

---

**4.** The retroactivity issue has not been briefed on this motion, and "retroactive application of decisions affecting periods of limitations is a question of some subtlety depending on the nature of reliance interests." *Short v. Belleville Shoe Manufacturing Co.*, 908 F.2d 1385, 1389–90 (7th Cir.1990), *cert. pending*, 90–526 (filed Sept. 26, 1990) (declining to resolve retroactive applica-

tion of new limitations period for Section 10(b) actions). We also note that the U.S. Supreme Court has granted certiorari on the question of the proper statute of limitations for 10(b) actions. *Reitz v. Leasing Consultants Associates*, 895 F.2d 1418 (9th Cir.1990), *cert. granted sub nom. Lampf Pleva Lipkind Prupis & Petigrow v.*

### 2. *Application of Alaska Statute of Limitations*

Under prior Second Circuit precedent, in a Section 10(b) action, a federal court sitting in New York, applies New York's statute of limitations provisions, including its borrowing statute, N.Y.Civ.Prac.L. & R. § 202.[5] *Ceres*, 918 F.2d at 353. The Second Circuit

> has construed this provision as meaning that in a § 10(b) action, the cause of action accrues "where 'its economic impact is felt, normally the plaintiff's residence.'" ... Thus, if a suit brought in the "place" of the plaintiff's residence would be time-barred, the suit in a New York federal court is time-barred.

*Id.* (quoting *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977)).

Defendant contends that the cause of action accrued in Alaska, where Mrs. Farr lived from 1980 until her death in May 1985.[6] Because federal courts have exclusive jurisdiction over claims under the 1934 Act, 15 U.S.C. § 78aa, plaintiff, if he had sued in Alaska, would have had to bring his claims in federal district court in Alaska, which would have been bound by the Ninth Circuit's determination that the statute of limitations of the forum state applied in Section 10(b) actions. *E.g., Nesbit v. McNeil*, 896 F.2d 380, 384 (9th Cir.1990). Thus, the federal district court in Alaska would have applied the Alaskan state limitations period, and this Court, applying New York's borrowing statute is required to do likewise. Plaintiff agrees that the Alaskan limitations period should apply. (Opp.Mem. at 18).[7]

The applicable Alaskan limitations period for a section 10(b) action is the two-year limitations period for "any injury to the person or rights of another not arising on contract." Alaska Stat. § 09.10.070; *Rob-*

*ertson v. Seidman & Seidman*, 609 F.2d 583, 586, 593 (2d Cir.1979). Because this action was filed on October 13, 1989, plaintiff's cause of action under Section 10(b) is time-barred if it accrued later than October 13, 1987.

While state law fixes the length of the limitations period, federal law determines when the period begins to run. *Armstong v. McAlpin*, [699 F.2d 79, 87 (2d Cir.1983) ]; *Arneil v. Ramsey*, [550 F.2d 774, 780 (2d Cir.1977) ]. The statute of limitations for securities fraud begins to run "when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Phillips v. Levie*, 593 F.2d 459, 462 (2d Cir.1979) (quoting *Stull v. Bayard*, [561 F.2d 429, 432 (2d Cir. 1977) ]). Thus, the statute is not tolled for a plaintiff's "leisurely discovery of the full details of the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975)). Moreover, plaintiffs bear the burden of proving diligence to toll the statute. *Freschi v. Grand Coal Venture*, 767 F.2d 1041, 1047 (2d Cir.1985), *vacated on other grounds*, [478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731] (1986).

*Kronfeld v. Advest, Inc.*, 675 F.Supp. 1449, 1457–58 (D.Conn.1987).

> The test as to when fraud should with reasonable diligence have been discovered is an objective one.... "[T]he means of knowledge are the same thing in effect as knowledge itself." ... "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits

---

*Gilbertson,* —— U.S. ——, 111 S.Ct. 242, 112 L.Ed.2d 201 (1990).

**5.** C.P.L.R. § 202 provides that "[a]n action based upon a cause of action accruing without [New York] cannot be commenced after the expiration of the time limited by the laws of ... the place without [New York] where the cause of action accrued...."

**6.** It is uncontested that Mrs. Farr lived in Alaska until her death. 3(g) Stmt. ¶ 12; Farr Dep. at 32. The allegation in the complaint that Mrs. Farr was a resident of Alabama, Cmpl't ¶ 4, should therefore be disregarded.

**7.** Plaintiff makes no contention that the cause of action accrued, for purposes of CPLR § 202, in Alabama where Richard Farr is resident.

that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."

*Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) (citations omitted).

The court is mindful that "[i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case," and that "[w]hen conflicting inferences can be drawn from the facts ... summary judgment is inappropriate." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir.1979). Here, however, the facts compel the conclusion that a duty of inquiry arose no later than the date plaintiff received the May 19, 1987 "Annual Report[s] and Presentment Offer[s]" detailing the status of the Indian Wells investments.

The gravamen of plaintiff's action, as it now stands, is that the investments were recommended to Mrs. Farr despite defendant's knowledge that they were *unsuitable* in that they were risky, non-liquid, could fail to produce income, and might even lose invested principal. There can be no dispute here that the May 19, 1987 communications, *on their face,* informed Farr that the investments were risky, had to date produced little or no significant income, and were projected by an independent appraiser to lose principal for the investors, over the life of the investments.

The May 19, 1987 letters, McDonough Affid. Exs. J and K, (each titled "Annual Report and Presentment Offer") revealed that the 1983 Fund had distributed in 1986 only $12.34 per $500 unit, equal to $246.80 per $10,000 investment, or a 2.46% return for 1986. Ex. J. at 1. While the report also set out the less alarming figure of a 30% distribution ($150.00 per $500 unit) over the approximately three years since

the Fund's inception (an average of 10% per year), *id.,* the 1986 figures indicated that the income stream was not steady or reliable. Even more dramatic and conclusive, was the annual presentment offer, through which, as promised in the prospectus, Indian Wells '83 offered to buy back partnership units at a price to be determined by an independent appraiser selected by Indian Wells. The appraisal set the value of a $500 unit of Indian Wells '83 at only $34.36, less than one tenth the purchase price.[8] Ex. J. at 3. When added to the total net distribution since inception, the total expected past and future distribution on a $500 unit amounted to approximately $184.00.

The numbers with respect to the '84 Fund were less drastic, but still projected a losing investment. Distributions in 1986 for the '84 Fund yielded a 10.8% return. In the approximately two years since inception, distributions yielded a 19% return. Ex. K at 1. The "presentment offer", however, painted a gloomier picture: the appraised value was $314.92 per $500 unit. Ex.K. at 3. When that figure was added to the total distributions to date, the total expected return per $500.00 unit was but $410.00. In other words, for both the '83 and '84 funds, a reasonable investor would have learned from the May 19, 1987 Annual Reports and Presentment Offers, that both partnership investments were projected to lose money for the limited partners.[9]

Farr knew that his mother wanted a secure income, Farr Dep. at 19, and no evidence suggests that she was interested in or had a need for speculative or risky ventures, or that Farr thought that she had intended to make any such investments. Farr has testified that he knew his mother's investment goal was secure income, that she wanted "conservative, secure investments, that would produce steady future income and preserve her capital," that

**8.** The appraisal estimated future net revenue (before adjustments for time-value of money, liabilities, etc.) at only $162.18 per $500 unit. Ex. J at 3.

**9.** Statements in each of the annual reports that "the general partners do not recommend the sale of units," Ex. J at 3; Ex. K at 2, and that "[t]he general partners do not represent the dis-

counted cash purchase price to be a true 'fair market value' ..." Ex. J at 3; Ex. K at 2, did not make it any more reasonable for an investor to ignore the clear implications of the figures set out in the reports. Even if the appraised value did prove eventually to be lower than the fair market value, it certainly presented a reason for inquiry and investigation.

she had no other source of income than her trust, and that she was concerned that she be able to pay her medical expenses. (Farr dep. 18–19, 44, 46.) Farr points to no evidence which would suggest that he believed that Mrs. Farr would have intended to make a high-risk investment.

Farr, therefore, had actual notice by May 1987 that the investments were unsuitable, and he must be held to be on inquiry notice that the unsuitability might have been fraudulent.[10] Farr, however, did not undertake any investigation or inquiry whatsoever until he received the solicitation letter from Beigel & Sandler, shortly before this action was filed. Farr dep. at 71–73.

While in certain cases, the mere fact that an investment's value declines sharply may not by itself put an investor on notice of fraudulent statements or omissions in a prospectus, see Robertson, 609 F.2d at 591; cf. Hupp v. Gray, 500 F.2d 993, 996–97 (7th Cir.1974), here it is the "mere fact" of the decline in value which forms the basis of plaintiff's claim. It was the fact, in and of itself, that the amount tendered for repurchase of partnerships units was small, and the income payments had been low, that revealed that the investment had proven risky and non-liquid—the premise for plaintiff's claim of unsuitability. No later than his receipt of the May 19, 1987 letters,[11] Farr conclusively knew that these investments had in fact proven to be risky. By that time, Farr reasonably should have

known that the investments were unsuitable; he offers no facts or argument why that knowledge should not have promptly led to an inquiry as to whether defendant's fraud lurked behind the unsuitable investment decisions.[12]

Indeed, it does not appear that plaintiff acquired any material information at all between May of 1987 and the time this action was filed, other than the information that Beigel and Sandler were pursuing litigation against defendant. The only possibly relevant information that Farr perhaps did not possess as of May 1987—the contents of the prospectuses—was as available to him in the summer of 1987 as it was at any time thereafter. Where there is no change in circumstances between the date a plaintiff is put on inquiry notice and the date of claimed actual notice, the earlier date applies. Landy v. Mitchell Petroleum Technology Corp., 734 F.Supp. 608, 618 (S.D.N.Y.1990) ("change in circumstances" not "mere delay" is required to justify later discovery of claim).

The conclusion that a reasonable investor should have been on notice no later than May 1987, is buttressed by Farr's testimony that he himself felt "general concern over the series of letters [i.e. the quarterly correspondence from Indian Wells '83 and '84], as I recall, that were somewhat similar in nature." Farr Dep. at 71. His concern was "basically that whatever investment this was, was apparently turning

---

**10.** Even though the May 19, 1986 letter with respect to the Indian Wells '84 was less alarming than the '83 Fund letter, it nevertheless also revealed that the '84 investment was destined to lose money, thus revealing the basis for an unsuitability claim. Further, even if the '84 letter would not, by itself, have given notice to Farr, the fact that the '83 letter did reveal that that investment had become substantially worthless, combined with the knowledge that the '83 and '84 investments were identically structured, did put Farr on inquiry notice regarding the '84 investment as well. See Bresson v. Thomson McKinnon Securities, Inc., 641 F.Supp. 338, 345 (S.D.N.Y.1986) (announcement that revealed, among other things, projected losses and decline in repurchase price of oil and gas limited partnerships for 1981 and 1982 funds, put plaintiff on notice of fraud claim as to 1983 fund, even though announcement reassured investors in the 1983 fund and cutbacks did not apply to 1983 fund).

In addition it is uncontested that Mrs. Farr's investment in Indian Wells '84 was unsolicited. 3(g) Stmt. ¶ 7. Plaintiff has offered no explanation how an unsolicited order can be the basis for a claim of fraudulently recommending the purchase of an unsuitable security.

**11.** Farr has testified that he received the May 19, 1987 letters on or about May 19. Farr dep. at 82. He also testified that he received the other Indian Wells correspondence on or about the dates on the letters. Id. at 70.

**12.** Unlike the situation in Robertson, here there can be no contention that plaintiff had no reason to suspect this defendant; it is clear that any suspicion that an investment had been wrongfully recommended despite its unsuitability would focus on the recommender—defendant here—as the most likely culprit.

out very badly" and that "there was a problem here that we had very little control over...." *Id.* This was a "continuing concern" from the time Farr first began to receive Indian Wells correspondence in Spring of 1986. *Id.* at 72. Nevertheless, Farr did not make any inquiry or undertake any investigation—not even to call Gerber [13]—until the letter from Beigel & Sandler arrived.

That Farr's behavior did not meet the standard of "reasonable investor" is demonstrated also by his admission that "I would briefly review [Indian Wells correspondence]. But I rarely read it in any amount of detail." *Id.* at 82. With regards to the May 19 letters, Farr "do[esn't] recall ever having read either of those in any amount of detail.... I have no recollection of having gone through these in any detail before at all." *Id.* Having failed to perform even the most basic of tasks of a "reasonable investor"—reviewing correspondence from management—plaintiff cannot now be heard to contend that he had no notice of what that correspondence clearly revealed.[14]

■ The objections raised by plaintiff to the application of a May 1987 accrual date are meritless. Plaintiff contends that

Mrs. Farr believed that Gerber had invested her money wisely and that there was little risk associated with those investments (Farr Dep. at 50). Second, Mrs. Farr trusted and confided in E.F. Hutton and believed that E.F. Hutton would not recommend an investment that was inconsistent with her investment objectives. (Farr Dep at 19, 47).

Opp. at 19. That Mrs. Farr trusted Gerber and Hutton and believed that they would not recommend a risky investment would not have excused her, and certainly does not excuse her son, from recognizing and acting upon facts which should have called those beliefs into question. To the extent that plaintiff is relying upon the existence of a fiduciary relationship between defen-

dant and Mrs. Farr, he is reminded that the existence of a fiduciary relationship does not relieve a plaintiff of his obligation to make an inquiry where there is reason to suspect the probability of wrongdoing. *Zola v. Gordon*, 685 F.Supp. 354, 367 and n. 14 (S.D.N.Y.), *modified*, 701 F.Supp. 66 (1988).

Plaintiff also contends that "plaintiff was not privy to the 'details' of Mrs. Farr's investments," Opp. at 19, and points to Farr's testimony that "Mrs. Farr was 'generally fairly circumspect in discussing financial affairs with me or anybody else....' (Farr Dep. at 18.)" It is uncontroverted, however, that Farr knew his mother's investment goal was secure income. *See* discussion, *supra* at 1225.

■ In addition, plaintiff objects that he "did not request the Prospectuses for the Investments until *after* plaintiff's attorneys herein had initially contacted him (which request was made of Gerber and never satisfied) (Farr Dep. at 58–59)." Opp. at 19. Our conclusion that Farr was put on notice by May 1987, however, does not require or presume that Farr was aware of the contents of the prospectuses, but rather is adequately supported by the contents of the May 19 Annual Reports standing alone. It is thus irrelevant that Farr did not receive the prospectuses from Gerber following his request. Defendant's failure to supply the prospectuses upon Farr's request is also irrelevant to any claim that it actively concealed its fraud, because the request was not made until after Farr had received actual notice in the form of Beigel & Sandler's solicitation letter. Further, that Farr did not request prospectuses, even after receipt of the May 19 letter, but waited until after he received actual notice, is additional support for the conclusion that he did not act as a reasonable investor.

■ Finally, plaintiff contends that defendant attempted actively to conceal its

---

**13.** The Estate still had an account at Hutton's Anchorage branch at the time, Farr dep. at 9–10, and Gerber, still a broker at Hutton, was "working fairly closely" with Farr's brother-in-law in Anchorage. *Id.* at 19–20.

**14.** We note that Mr. Farr is well educated, has maintained brokerage accounts, subscribed to *Business Week*, and at the time in question understood what a limited partnership was, how it operated, and that it was a "[v]ery illiquid investment." Farr dep. at 6–12.

fraudulent conduct as evidenced by certain statements included in its correspondence to investors. *See* Opp. at 19–21; Cmpl't ¶ 26 at 7.[15] In cases where a defendant has engaged in active concealment of its fraud, a plaintiff need not establish his diligence in attempting to discover his cause of action. *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir.1986); *Clute v. Davenport Co.*, 584 F.Supp. 1562, 1578 (D.Conn.1984). That rule, however, does not help plaintiff here. The statements which plaintiff points to, even when taken together, can not reasonably be understood as intended to or capable of concealing the crucial facts revealed by the May 19 Annual Reports— the rate of return on investment to date, and the repurchase price. Indeed, read in their entirety, the communications presented a clear portrait, as Farr himself recognized, of an investment that was performing poorly. Even as presented in plaintiff's brief, in isolation and out of context, these statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance[16] do not rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry presented by the cold numbers contained in the May 19 Reports. Nothing in those statements could hide from a reasonable investor after May 19, the simple facts that the investments were risky, non-liquid,

and had a serious potential to lose money. In addition, as to those statements made after May 19, Farr is not "entitled to rely on 'reassuring comments' given [him] after [he] received [clear] knowledge of the fraud." *Zola v. Gordon*, 685 F.Supp. 354, 366 (S.D.N.Y.), *modified* 701 F.Supp. 66 (1988) (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir.1987)).[17]

We therefore hold that plaintiff's cause of action accrued in May 1987, upon Farr's receipt of the May 19 letters. Plaintiff's section 10(b) claim is thus barred by the applicable two year statute of limitations, if not by the one year/three year limitations period set out in *Ceres.*

### 3. *State Claims*

■ Plaintiff's state law claims for fraud, negligence, and breach of fiduciary duty are also governed by Alaska's two-year statute of limitations for tort actions, Alaska Stat. 09.10.070.[18] *See, e.g., Sharrow v. Archer*, 658 P.2d 1331, 1333 n. 3 (Alaska 1983); *Van Horn Lodge, Inc. v. White*, 627 P.2d 641, 643 (Alaska 1981). Alaska applies essentially the same standards for accrual and equitable estoppel as were relied upon in the discussion above, *see, e.g., Dalkovski v. Glad*, 774 P.2d 202, 206 (Alaska 1989) (accrual); *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 291–93 (Alaska 1988) (claim accrues on "date when a reasonable person has enough information to alert that person

---

**15.** In addition to the disclaimers regarding presentment in the May 19, 1987 annual reports, *see* note 9, *supra,* the statements which plaintiff contends concealed the true state of the Indian Wells investments are: (1) statements in the May 1986 '83 report that benchmark oil prices had increased somewhat, that if the trend continued, the partnership could expect an increase in the price it received for oil, and that an expected worsening of the oversupply of natural gas was attributable to the coming warm weather season; (2) a statement in the August 11, 1986 report that "oil and gas are cyclical in demand and prices are not likely to stay at their current levels indefinitely"; (3) statements in the November 18, 1986 report attributing the second quarter deficit to non-recurring equipment costs as well as declining oil and gas prices, promising to cut expenses to increase the return to the limited partners, and noting that the third quarter distribution demonstrated a "positive cash flow" to limited partners for that quarter; (4) a prediction in the November 18,

1986 report for Indian Wells '84 that the partnership funds would be fully invested in oil and gas properties by the end of the year; (5) statements in the May 2, 1988 reports that the general partners remained "committed to the goal of providing the best possible rate of return to … the limited partners," and would be "mindful of economy of operations." Opp. at 20–21, and Cmpl't ¶ 26 at 7.

**16.** Plaintiff does not appear to contend, and certainly has introduced no evidence to demonstrate, that these explanations for poor performance were materially false.

**17.** There can be no contention here that those statements rise to a level which would permit plaintiff to invoke equitable estoppel. *See Zola*, 685 F.Supp. at 361 n. 6.

**18.** Plaintiff does not contend that any other state's limitations period should apply to the state law claims.

that he or she has a potential cause of action or should begin an inquiry to protect his or her rights"; also setting out standard for estoppel); *Gudenau & Co., Inc. v. Sweeney Insurance Inc.*, 736 P.2d 763, 766–69 (Alaska 1987) (standards for accrual and equitable estoppel), and these standards compel the same result. Accordingly, we hold that plaintiff's state law claims are barred because they were filed more than two years after May 1987.

### III. *Conclusion*

For the foregoing reasons, plaintiff's second claim, for violations of Section 17(a) is dismissed with prejudice for failure to state a claim. Defendant is entitled to summary judgment on plaintiff's first, third, fourth, and fifth claims. This Order thus disposes of this action in its entirety, and the Clerk of the Court shall enter judgment accordingly.

SO ORDERED.