Evelyn BENFIELD and Albert Kinzinger, Jr., individually and on behalf of all those similarly situated, Plaintiffs–Appellants,

v.

MOCATTA METALS CORPORATION, the Mocatta Corporation, and Metals Quality Corporation, Defendants–Appellees.

No. 1393, Docket 93–9230.

United States Court of Appeals, Second Circuit.

Argued April 4, 1994.

Decided June 15, 1994.

J. Dennis Faucher, New York City (Miller Faucher Chertow Cafferty and Wexler, and Christopher Lovell, P.C., New York City, of counsel), for plaintiffs-appellants.

Gandolfo V. DiBlasi, New York City (Kenneth M. Raisler, Charles Sullivan, Patricia M. Clarke, Sullivan & Cromwell, New York City, of counsel), for defendant-appellee Mocatta Metals Corp.

Earl H. Nemser, New York City (Howard R. Hawkins, Jr., Gary J. Mennitt, Susan F. DiCicco, Cadwalader, Wickersham & Taft, New York City, of counsel), for defendant-appellee The Mocatta Corp., currently known as The Falconwood Corp., and formerly known as Metals Quality Corp.

Stanley M. Grossman, President, New York City, and Jonathan W. Cuneo, General Counsel, Washington, D.C., submitted a brief for National Ass'n of Securities and Commercial Law Attys., amicus curiae.

Before: VAN GRAAFEILAND, McLAUGHLIN and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Evelyn Benfield and Albert Kinzinger, Jr. appeal from a judgment of the United States District Court for the Southern District of New York (Preska, J.)[1] dismissing on statute of limitation grounds their Second Amended Complaint against Mocatta Metals Corporation, The Mocatta Corporation, and Metals Quality Corporation. The defendant corporations, which dealt in precious and non-precious metals, were commonly owned and closely related, and they acted in combination in their dealings with appellants. They will be designated herein simply as Mocatta. At all times hereinafter mentioned, International Trading Group ("ITG") was a Futures Commissions Merchant, registered to act as such with the Commodity Futures Trading Commission. ITG dealt principally with off-exchange commodity options known as "dealer options" granted by Mocatta.

Dealer options, such as are involved herein, have a peculiar or distinct status in the commodities law which is described in some detail in paragraphs 14 through 20 of plaintiffs' Second Amended Complaint. Because the accuracy of this pertinent description is undisputed, we quote it at length:

14. Because of rampant fraud in the marketing of commodity options, in 1978 Congress adopted Section 4 of the CEA [Commodity Exchange Act], which banned the sale of commodity options. This options ban included a ban on off-exchange commodity options known as "dealer options."

15. Congress permitted an exemption to the ban on option sales, but this exemption was subject to strict compliance with

---

1. Although the final judgment was signed by Judge Preska, all intermediate opinions and orders were entered by Judge Louis J. Freeh, who resigned from the bench to assume the position of head of the F.B.I.

the rules and regulations established by the Commodity Futures Trading Commission ("CFTC"). In accordance with this rule-making authority, the CFTC suspended the sale of all commodity options. In so doing, the CFTC stated that:

> The available evidence demonstrates to the Commissioner's satisfaction that an overwhelming majority of the firms that engage in the offer and sale of commodity options in this country employ and cause to be employed practices and procedures that are fraudulent or otherwise illegal or unsound and that these practices and procedures pose a substantial threat to members of the general public.

43 F.R. 16153; [1977–80 Tr. Binder] Comm.Fut.L.Rep. (CCH) para. 20,588 at p. 22,431 (CFTC April 17, 1978).

16. With respect to dealer options, such as those granted by defendants, the CFTC expressed concern that their sale, if permitted to continue, would fill the void left by the ban on fraudulent foreign commodity options known as "London Options." The CFTC said:

> The Commission believes that if dealer options sales to the public are permitted to continue while virtually all other option trading is suspended, those firms that have been selling foreign options in an illegal and unsound manner may begin marketing dealer options in a similar fashion, thereby effectively undermining the basic purpose for which the suspension is being imposed.

*Id.*

17. Faced with a disruption in the substantial profits they made granting dealer options, defendants argued to the United States Congress, and petitioned the CFTC, for relief from the suspension. In testimony to the United States Congress, given before the Subcommittee on Conservation and Credit of the Committee on Agriculture of the House of Representatives during hearings held on February 21–23 and April 11, 1978, Henry Jarecki ("Jarecki"), then Chairman of Mocatta Metals and now Chairman of Falconwood, argued that the banning of Mocatta options was "unfair", "irrational", "unnecessary", and "against the public interest". Jarecki testified that defendants dealt only with "first class" and "reputable" Futures Commissions Merchants ("FCMs") and there had never been any problems or abuses associated with the sale of Mocatta options.

18. The plan initiated by defendants resulted in the adoption by the CFTC of Part 32 of its Regulations consisting of Sections 32.1–32.12. These regulations establish the terms and conditions under which grantors and FCMs may sell dealer options to the public.

19. The regulations include, among other things, the requirement that the option grantor be jointly and severally liable with the option seller or FCM, regardless of the option grantor's fault, for all damages sustained as a result of any unlawful act or omission or any breach of contract by any person who facilitated the sale of the grantor's dealer option(s) to an option customer. Section 32.12(a)(2) requires that the grantor's liability be set forth as an express contractual term of each and every option that it grants. Section 32.12(b)(4) imposes this liability whether or not the option contract contains the required provision. These requirements were designed to assure a close link and sense of responsibility between the grantor and seller of dealer options. The option grantor was expected by the CFTC to be "circumspect in choosing the firms through which it deals."

20. Section 4c(d) of the CEA and Regulation 32.12 also limit the number of firms that can grant dealer options. A small group of metals marketing firms, including defendants, were permitted to grant dealer options to the public to the exclusion of firms that were not engaged in that business prior to May 1, 1978. In the years following the adoption of Regulation 32.12, this gave defendants a significant advantage by restricting competition of firms that might otherwise have been in a position to grant dealer options. In sales literature distributed to ITG by Mocatta Metals for use in the sale of defendants' dealer options, ITG brokers were instructed that "Mocatta Metals Corporation is presently

the only company in the U.S. to meet the exacting requirements of the CFTC."

■ It is in the light of the foregoing allegations that we review appellants' contentions on appeal that the district court erred in holding that knowledge gained by them of ITG's fraudulent and improper conduct in connection with their purchases of Mocatta options and Mocatta's "possible involvement" in the wrongdoing put them on notice of Mocatta's role as an aider and abettor of such wrongdoing. (Appellants' first of three "Issues Presented" for review.) *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992); *Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir.1977); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410–11 (2d Cir.1975).

Benfield allegedly lost over $81,000 between September 1984 and December 1985 through ITG's fraudulent and bucket shop sales of Mocatta options. As stated in Benfield's complaint, she brought suit in California against ITG on May 13, 1988 but did not join Mocatta as a party-defendant. On October 12, 1989, the suit, which had grown into a multi-member class action, was stayed for a period of six months. After that, it proceeded to a $492 million default judgment on May 20, 1991 against the by-then defunct ITG. On June 19, 1991, Benfield brought the instant action. Kinzinger, who purchased a Mocatta option in 1987, joined the litigation in 1992. The district court held that, on the basis of the undisputed allegations in the complaint, plaintiffs' aiding and abetting claims were barred by the two-year statute of limitation prescribed in 7 U.S.C. § 25(c). We agree.

As is obvious from the allegations in the complaint, long before the two-year limitation period expired, plaintiffs had at least constructive knowledge of ITG's fraudulent conduct and the close relationship between ITG and Mocatta that is demonstrated in the Regulation of Commodity Option Transactions, 17 C.F.R. Part 32. This is particularly true with respect to section 32.12(b)(4), which, in substance, makes grantors such as Mocatta jointly and severally liable with its Futures Commissions Merchants such as ITG for any of the latter's unlawful acts or omissions in connection with the offer or sale of a Mocatta option. The very existence of section 32.12(b)(4) was assurance, in appellants' own words, of a "close link and sense of responsibility between the grantor and seller of dealer options."

Plaintiffs alleged that "[w]hen the sale of dealer options was banned, defendants argued to Congress that their practice of auditing selected FCMs with which they dealt was a method of self-regulation which justified their being permitted to continue to grant dealer options," and Mocatta's sales literature intended for distribution to ITG's customers assured the customers that Mocatta was "the only company in the U.S. to meet the exacting requirements of the CFTC." These requirements included the filing by Mocatta of detailed monthly reports concerning its commodity options business, the contents of which almost inevitably would place Mocatta on notice of any substantial wrongdoing. *See* 17 C.F.R. § 32.12(g). Where, as here, the circumstances known to plaintiffs, as alleged in the complaint, were such as to suggest to a person of ordinary intelligence that Mocatta bore some responsibility for ITG's fraud, a duty of inquiry arose; and, if inquiry would have disclosed Mocatta's participation in the wrongdoing as an aider and abettor, knowledge of that fact was properly imputed to plaintiffs. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983). The district court correctly dismissed appellants' claim against Mocatta as an aider and abettor.

■ Kinzinger's commodities claim differs somewhat from Benfield's in that it involves only a single transaction and alleges both aiding and abetting and vicarious liability. However, the district court did not err in dismissing the vicarious liability claim also. (Appellants' second "Issue Presented" for review.) Kinzinger alleges that he was given virtual assurances of profit and was told that, of the last fifty trades recommended by ITG's financial adviser, only one or two had lost money. Kinzinger also incorporated by reference the California class action judge's numerous findings of false and fraudulent statements and representations. Influenced

by these false representations, Kinzinger purchased one silver call option in May 1987 for $1,800. Four months later his entire investment was lost. Even in this age of monetary inflation, $1,800 cannot be considered pocket money; its loss within a matter of months in a highly recommended investment should have caused eyebrows to raise. In the instant case, it imposed upon Kinzinger a duty of inquiry that would, as was true in Benfield's case, have disclosed the nature and extent of Mocatta's involvement. *See Hupp v. Gray*, 500 F.2d 993, 996–97 (7th Cir.1974); *Farr v. Shearson Lehman Hutton, Inc.*, 755 F.Supp. 1219, 1224–28 (S.D.N.Y.1991). Kinzinger's claim of vicarious liability was barred by the Commodity Exchange Act's two-year limitation period. 7 U.S.C. § 25(c).

■ Kinzinger's claim of a RICO violation by Mocatta, (appellants' third "Issue Presented" for review) is not so readily disposed of. Although, in the 1988 action, ITG and several of its officers were alleged to have violated RICO, 18 U.S.C. § 1962(d), the $492 million default judgment in that action contained no reference to RICO. Benfield's complaint in the instant action, filed less than one month after the default judgment, likewise contained no reference to RICO. About one year later, Benfield sought permission to file an amended complaint adding Kinzinger as a party and incorporating a RICO cause of action. The district court denied the application to add a RICO claim on Benfield's behalf but conceded the possibility of a properly pleaded RICO claim on behalf of Kinzinger. However, after reviewing the once-again amended complaint, the district court held that Kinzinger's RICO cause of action likewise was barred by the RICO four-year limitation period. We conclude that this holding, based as it was upon a Rule 12(b)(6) motion, was error.

Kinzinger's counsel contends that his client's right to assert his RICO claim is supported by either the tolling of the limitation period under the doctrine of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), or by relation-back under Fed.R.Civ.P. 15(c), or by both. For either doctrine to apply, there must be a sufficient commonality between Mocatta's alleged acts of commodity wrongdoing and Kinzinger's allegation of RICO violations to preclude a claim by Mocatta of unfair surprise. The allegations in the instant complaint satisfied this requirement. To a large extent, proof of Kinzinger's RICO cause of action would require evidence of the same or similar wrongful acts and the testimony of the same or similar witnesses as would proof of Mocatta's alleged Commodity Exchange Act violations. Although RICO requires more in the way of evidence, *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), proof of the RICO cause of action nonetheless involves evidence of the underlying fraudulent acts pleaded by Benfield. Mocatta therefore was placed on notice that a RICO claim, based in large part on the fraud already alleged, might be made against it. *See Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). In rejecting the statute of limitation defense to the RICO claim, we do not pass upon the question whether, limitation issues aside, Kinzinger's RICO claim states a cause of action, an issue that first must be submitted to the district court.

In sum, then, we answer appellants' first two statements of issue in the negative and the third statement in the affirmative. We affirm the judgment appealed from except the portion that dismissed Kinzinger's RICO claim. We vacate the portion of the judgment that dismissed Kinzinger's RICO cause of action, without prejudice to such further assertion of the statute of limitation defense as may be justified hereafter by probative evidence, and remand to the district court for further proceedings consistent herewith.