## In re TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION, and Related Cases.

### No. 93 Civ. 0810 (WK) (AJP).

United States District Court,
S.D. New York.

Aug. 1, 1996.

As Amended Aug. 2, 1996.

---

Jared Stamell, Stamell & Schager, New York City, Daniel C. Girard, Girard & Green, San Francisco, CA, for Plaintiffs.

Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel; New York City, Joseph E. Coughlin, Lord Bissell & Brook, Chicago, IL, for Defendants.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

Before us is a Second Consolidated Amended Class Action Complaint ("the Complaint") in an action brought by plaintiffs on behalf of all persons who purchased or reinvested in notes issued by defendant Towers Financial Corporation during the period from February 15, 1989 through February 9, 1993.

One of the many defendants, the law firm of Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin (hereinafter "this defendant") has moved to dismiss the Complaint. Magistrate Judge Andrew J. Peck has filed a Report and Recommendation (the "Report") recommending that we grant such motion.

Having reviewed the Report *de novo*, we adopt it in its entirety and dismiss the Complaint as against this defendant. However, for reasons that follow, we shall allow plaintiffs to file a third amended complaint under specified conditions.

## DISCUSSION

### A. THE MAGISTRATE JUDGES REPORT

We shall briefly note our reasons for adopting Judge Peck's truly masterful Report. The entire Complaint consists of 172 pages and 569 paragraphs alleging 12 separate counts against various defendants. Four of these counts (consisting of 20 paragraphs) charge various violations of statutory and common law by this defendant, all based on the activities of Ira Sorkin, Esq., one of its partners.

The basic difficulty with plaintiffs' position is that nowhere in the entire Complaint is it suggested—let alone alleged—that (with the exception of a certain offer to repurchase securities which Sorkin is said to have drafted back in 1988, long before any possible statute of limitations would have taken effect) Sorkin ever made a specific statement which he knew or had reason to suspect was incorrect and which conceivably could have come to the attention of any member of plaintiff class.[1]

Moreover, the Complaint contains no suggestion—let alone allegation—that Sorkin had a fiduciary relationship with anyone but his own client.

### B. THE CONSPIRACY THEORY DEVELOPED BY PLAINTIFFS AT ORAL ARGUMENT

■ At oral argument of the instant motion to dismiss, plaintiffs' counsel developed a theory that this defendant could be held liable as the member of a conspiracy.

Before entering into a discussion of this theory, we wish to emphasize that our statement of assumed facts is based wholly upon assertions made by counsel in oral argument. While we were impressed with counsel's apparent sincerity, it is altogether possible that what a lawyer might say in the heat of argument will not survive the careful consideration necessary to the making formal allegations subject to sanctions. Accordingly, should a third amended complaint be filed, its validity would be judged by the allegations contained within its four corners, without reference to counsel's oral argument on any other extraneous source.

1. Plaintiffs seek to cure this particular defect by adding new named plaintiffs who would allege that, although the investments causing their loss were made in response to Offering Memoranda issued by Towers in 1989, 1990, 1991 and 1992, they received Sorkin's 1988 "rescission offer" and remembered—and were influenced by the recollection of—its content when they made their subsequent purchases. It seems to us highly unlikely that any finder of fact would credit such a claim. Accordingly, in the exercise of our discretion we would not—regardless of any other consideration—permit the addition of named plaintiffs for the sole purpose of asserting it.

With that caveat, we shall consider (1) the scope of the claimed conspiracy and (2) this defendant's claimed connection therewith.

## I. THE CLAIMED CONSPIRACY

Back in 1986, Steven Hoffenberg and several other persons (hereinafter the "conspirators"), acting through defendant Towers Financial Corporation, decided to enrich themselves by embarking upon a so-called "Ponzi" scheme. The way this particular Ponzi scheme was designed to work was that Towers would issue Offering Memoranda representing that it had developed a remarkably profitable operation that would earn profits in such amounts as to permit the payment of fantastic rates of interest on the capital necessary to finance it. In fact, however, the conspirators had developed no profitable operation of any sort, and never intended to do anything with the money received from gullible investors but (a) to apply it to their own purposes and (b) to use it for the payment of interest owing to other investors.

The conspiracy ran into some difficulty in 1988 when the Securities Exchange Commission discovered that in 1986 Towers had violated § 5 of the Securities Act of 1933 ("the Securities Act") by selling $37 million worth of unregistered securities ("the 1986 notes"). The SEC, having at this time no suspicion of the basic fraudulent nature of the Towers operation, permitted the conspirators to dispose of its investigation by entering into a consent decree which required, among other things, that Towers make an offer of rescission to the holders of these notes.

Such an offer was made, couched in such terms that only a small percentage of the noteholders took advantage of their opportunity to recoup funds they had advanced, and Towers had to pay back only $440,000 of the $37 million it had received from the 1986 Noteholders. Had a substantial majority of these noteholders reclaimed their investments, Towers, thus being deprived of funds to pay interest on its other notes, would have been forced to default. The Ponzi scheme would then have been over.

This disaster having been avoided, the scheme was able to continue until February of 1993 when the SEC, having discovered the scheme's basic fraudulent character, was able finally to close it down. Between Towers' issuance of the 1988 rescission offer and the SEC's successful termination of the conspiracy, Towers had issued four fraudulent Offering Memoranda and collected a total of 400 million dollars from gullible investors.

## II. THE DEFENDANT'S ENTRY INTO THE CONSPIRACY

It is plaintiffs' theory that this defendant's involvement in the conspiracy was brought about by the activities of its partner Ira Sorkin. Plaintiffs contend that Sorkin knowingly and wilfully entered into the conspiracy in 1988 when Towers was faced with the problem of issuing a rescission offer drafted in such a way as to give the appearance of propriety while effectively dissuading investors from accepting it; and that Sorkin—with full knowledge of the fraudulent nature of the Towers enterprise and of the utter worthlessness of these particular notes—proceeded to accomplish this precise result, in flagrant violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("section 10(b)"), and Securities and Exchange Commission Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

It is further plaintiffs' contention that, having thus saved the life of the conspiracy, Sorkin continued to perform a wide variety of overt acts which, while probably unpunishable in and of themselves, were knowingly and wilfully performed for the principle purpose of keeping the conspiracy alive and allowing it to achieve its unlawful objectives.

Plaintiffs do not claim to have access to any evidence that Sorkin ever saw any of the fraudulent Offering Memoranda the issuance of which his activities made possible, or that he had knowledge of the exact terms of any of them. They contend, however, that a person of Sorkin's experience must have been—and that Sorkin actually was—fully aware of the general contours of such Offering Memoranda; and that *all* of the Offering Memoranda issued during his alleged in-

volvement in the conspiracy complied with his expectations in this regard.

If plaintiffs can put these allegations—which were so eloquently described by their counsel at oral argument—into a formal pleading, such a pleading would constitute a valid allegation that Sorkin had knowingly and wilfully engaged in a deliberate conspiracy unlawfully to obtain funds by the deception of investors, in violation of Rule 10b–5.[2]

## C. IS THE POSSIBILITY OF RULE 10b–5 CONSPIRACY LIABILITY PRECLUDED BY *CENTRAL BANK OF DENVER v. FIRST INTERSTATE BANK* (1994) 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119?

■ At the outset, we recognize that as far as we can determine, with the exception of one district court which was effectively overruled by the Ninth Circuit Court of Appeals, every court which has considered this question has answered it in the affirmative, ruling that the Supreme Court's decision in *Central Bank*, which held that no private right of action exists for *aiding and abetting* a violation of Rule 10b–5, also prohibits actions for conspiracy to violate that rule. Cases so holding include one by the Ninth Circuit Court of Appeals and six by judges of the Southern District of New York. *See e.g. In re GlenFed, Inc. Securities Litigation* (9th Cir.1995) 60 F.3d 591; *Phillips v. Kidder, Peabody & Co.* (S.D.N.Y.1996, Francis, J.) 933 F.Supp. 303; *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.,* (S.D.N.Y.1995, Sweet, J.) 903 F.Supp. 479 (with a nationwide analysis of post-*Central Bank* authority); *SEC v. U.S. Envtl., Inc.* (S.D.N.Y.1995, Leisure, J.) 897 F.Supp. 117; *In re College Bound Consolidated Litigation* (S.D.N.Y. 1995, Mukasey, J.) 1995 WL 450486; *In re*

*Faleck & Margolies, Ltd.* (S.D.N.Y.1995, Kram, J.) 1995 WL 33631.

With due respect for these decisions, none of which controls us, we find none of them persuasive in light of the claims before us.

In the first place, the facts in *Central Bank* do not raise even the shadow of a question related to possible conspiracy liability. The petitioner in that case, Central Bank, served as an indentured trustee for several bond issues which were secured by landowner assessment liens. Bond covenants required that the land subject to the liens be worth at least 160% of the face value of the bonds, and that the developer of the land, AmWest Development (hereinafter "AmWest"), annually report to Central Bank whether or not the 160% test was being met.

In a year when property values in the area were declining, AmWest nevertheless reported that the 160% test was being met. Central Bank's in-house appraiser suggested that AmWest's figures were optimistic, and the underwriter suggested to Central Bank that it get an outside appraiser to conduct an independent review. Despite this, Central Bank, after an exchange of letters with AmWest, delayed independent review of the appraisal. Before such a review was complete, the bond issuer defaulted, resulting in a loss of $2.1 million to the respondents.

They sued AmWest, the bond issuer, and the underwriters of the bonds for primary violations of section 10(b). They further alleged that Central Bank, as the indentured trustee for the bond issues, was "secondarily liable" for its conduct in aiding and abetting the fraud.

The Supreme Court noted the Tenth Circuit's understanding that the relevant elements of a section 10(b) aiding and abetting cause of action were: "(1) a primary violation

---

**2.** The statute of limitations for Rule 10b–5 claims is three years. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson* (1991) 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (10b–5 claims must be brought within one year of discovery, but no later than three years after the violation). The date on which the Ponzi scheme was shut down by the SEC—February 8, 1993—marks the start of the limitations period. Because an above-described amended complaint would relate back to the original complaint, filed on February 10,

1993, it would not be time-barred. Fed.R.Civ.P. 15(c)(2); *see e.g. Benfield v. Mocatta Metals Corp.* (2d.Cir.1994) 26 F.3d 19, 23; *131 Main St. Assocs. v. Manko* (S.D.N.Y.1995) 897 F.Supp. 1507, 1521; *Pollack v. Laidlaw Holdings, Inc.* (S.D.N.Y. 1995) 1995 WL 261518, *23; *In re Ivan F. Boesky Securities Litigation* (S.D.N.Y.1995) 882 F.Supp. 1371, 1380–81 (citing other decisions in this District allowing relation back of otherwise untimely amendments adding section 10(b) claims).

of s 10(b); (2) recklessness by the aider and abettor as to the existence of the primary violation" (511 U.S. at —, 114 S.Ct. at 1443); and that it had held that Central Bank's conduct could "support a finding of extreme departure from standards of ordinary care," (*id.* at —, 114 S.Ct. at 1444), and could therefore be held "secondarily liable" for the fraud. Later in its opinion, the Supreme Court specifically noted that "recklessness, *not intentional wrongdoing,* is the theory underlying the aiding and abetting allegations in the case before us." *Id.* at —, 114 S.Ct. at 1455 (emphasis added). This does not seem to us the action of a Court that considered itself to be eliminating the possibility of Rule 10b–5 conspiracy liability for *intentional* wrongdoers.

As above noted, Judge Sweet's opinion contains a nationwide analysis of relevant post-*Central Bank* authority. 903 F.Supp. at 496. Perhaps the opinion which most accurately catches the spirit of all these decisions is one that observed "[t]o permit a private plaintiff to maintain an action for conspiracy to violate Rule 10b–5 would make *Central Bank of Denver* meaningless, since virtually every aiding and abetting claim can be alleged as a conspiracy claim." *Id.* at 498, citing *In re Faleck & Margolies, Ltd.,* (S.D.N.Y.1995) 1995 WL 33631, * 12. It seems to us that this is not an apt description of a doctrine that was established by a case in which—as the deciding Court specifically noted—the facts would not support any allegation of *intentional* wrongdoing, which would eliminate the possibility of any allegation of conspiracy.

In addition, most of the cited opinions speak of aider and abettor liability as *similar* to conspiracy liability. We find no logic in this assumption. How can it be said that two liabilities are "similar" when one requires proof of knowing and wilful participation, while the other can be established by a showing of mere knowledge of someone else's violation and some degree of carelessness in failing to prevent it?

By the same token, the opinions treat aiders and abettors and conspirators as though

both were *secondary* or *peripheral* actors. In our view, no rational person could characterize Sorkin's claimed conduct as secondary or peripheral to the five year continuation of this $400 million fraud.[3]

Accordingly, plaintiffs' motion for leave to replead is granted with the following specifications: any third amended complaint must be served on or before September 2, 1996; and the complaint must confine itself exclusively to claims against this defendant and contain no allegations that are not relevant thereto. If the complaint is so confined, any decision on an expected motion to dismiss could be presented to the Court of Appeals uncluttered by extraneous matters. Should we grant the motion to dismiss, such decision would dispose of the entire controversy alleged in the complaint, and would be appealable as of right. Should we deny the motion, we would undoubtedly certify the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and it seems inconceivable that the Court of Appeals would not accept it.

SO ORDERED.

---

**3.** We reiterate that we are speaking of *assumed* conduct which to date has not been alleged, let alone proved.