Robert W. DINSMORE, et al., Plaintiffs,

v.

SQUADRON, ELLENOFF, PLESENT, SHEINFELD & SORKIN, Defendant.

In re Towers Financial Corporation Noteholders Litigation, and Related Cases.

No. 93 Civ. 0810 (WK) (AJP).

United States District Court, S.D. New York.

Nov. 4, 1996.

Daniel C. Girard, Girard & Green P.C., San Francisco, CA, for Plaintiffs.

Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel, New York City, for Defendant.

## OPINION & ORDER

KNAPP, Senior District Judge.

Defendant Squadron Ellenoff (hereinafter "the defendant") moves to dismiss the Third Amended Complaint. The motion largely relies on arguments—supported by an article in the New York Law Journal [1]—which have influenced other courts to hold that *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) precludes the possibility of Rule 10b–5 conspiracy liability. We have explained our disagreement with that conclusion. *See* our Opinion of August 1, 1996, 936 F.Supp. 126. We shall not elaborate.

We shall, however, direct attention to the official transcript of the oral argument before the Supreme Court in *Central Bank.* That transcript explains why the Court specified that "recklessness, *not intentional wrongdoing,*[2] is the theory underlying the aiding and abetting allegations in the case before us." 511 U.S. at ——, 114 S.Ct. at 1455. It also prompts us to abjure the statement in our August 1 Opinion that "the facts in *Central Bank* do not raise even the shadow of a question related to possible conspiracy liability." 936 F.Supp. at 129. On the contrary, the transcript of oral argument reveals that at least two Justices, Kennedy and Scalia, were deeply concerned with "possible conspiracy liability", and apparently concluded that it could not be considered in light of the procedural situation established by the plain-tiffs-respondents' position in the district court.

By way of background, the *Central Bank* opinion specifically notes that the plaintiffs-respondents' complaint alleged only that the bank was "*secondarily liable* under § 10(b) for its conduct in aiding and abetting the fraud." 511 U.S. at ——, 114 S.Ct. at 1443. However, the Court's description of the facts contains the following statement (*Id.*):

> After an exchange of letters between Central Bank and AmWest in early 1988, Central Bank *agreed* to delay independent review of the appraisal until the end of the year, six months after the June 1988 closing of the bond issue. Before the independent review was complete, however, the authority defaulted on the 1988 bonds.

The existence of an "agreement" gave rise to the suggestion that petitioner-defendant might properly have been charged with conspiracy. Justices Kennedy and Scalia gave this suggestion serious consideration, but apparently felt constrained to reject it since— as just noted—the complaint had specifically limited the issue to one of secondary liability.

Rather early in the argument, Justice Kennedy raised the question by asking defendant-petitioner's counsel, in effect, why the case against his client could not be supported on a theory of conspiracy, saying: "Under the allegations of the complaint taken in the light most favorably to the plaintiff[s] [respondents], could there have been a cause of action or an allegation for liability * * * of the bank as co-conspirator?" In answer, counsel pointed out that the phraseology of the complaint made such a result impossible, saying: "What they chose to do here, Your Honor, was to not sue us as a primary violator, but instead to sue us as an aider and abettor."

Later on, Justice Scalia came back to the question, asking: "What about a cause of action for conspiracy to violate 10(b)?" This provoked an observation by counsel that the question was "not presented here", and some discussion as to whether or not one could "become a co-conspirator by being reckless."

1. Edward Brodsky, *The Conspiracy Question Revisited: The Scope of § 10(b),* Sept. 9, 1996, at 3.

2. Throughout this opinion, any emphasis by italics is ours.

Justice Scalia's final word on recklessness was: "I'm certain you cannot become a co-conspirator by being very reckless. You have to have an agreement, the intent to make alliance with the other person."[3]

The foregoing suggests that at least two of the Justices considered that a well pleaded complaint could successfully allege a claim for conspiracy to violate section 10(b).

Against this background, let us look at the plaintiffs' Third Amended Complaint (hereinafter "the Complaint"). Our August 1 Opinion granted plaintiffs leave to file yet another complaint to test the validity of their counsel's assertion that defendant had participated in a conspiracy to violate section 10(b) and Rule 10b–5. In purported response to this permission, plaintiffs have filed a Complaint requesting a jury trial and containing eighty-five paragraphs of "background" material purporting to support two accusatory "counts." Count I alleges, among other things, the suggested conspiracy. Count II alleges a pendant state claim of common law fraud. Comparing this Complaint with previous ones filed by plaintiffs, defendant—in the introductory passage of its memorandum in support of its motion to dismiss—justifiably complains that "plaintiffs continue to escalate their attack by characterizing the firm's alleged role in the Towers debacle in progressively more radical terms."

To deal with this situation, and to reduce the Complaint to fit the permission which our August 1 Opinion granted, we hereby: (a) dismiss Count II in its entirety; and (b) eliminate from Count I all references to anything but the above mentioned conspiracy. Interpreting, as we must for the purposes of this motion, all aspects of the Complaint "in the light most favorably to the plaintiff[s]," we find that factual allegations scattered throughout the "background" paragraphs adequately allege the claimed conspiracy. The rest can be ignored as surplusage.[4] Magistrate Judge Andrew J. Peck has been assigned to oversee pretrial matters. He will make sure that the parties' endeavors are confined to proving or disproving defendant's participation in Hoffenberg's conspiracy (the existence of which no one disputes).

If the case goes to trial the jury will be instructed that it can find liability against the defendant only if it finds *by clear and convincing evidence*,[5] that:

(1) Sometime before December of 1988 Steven Hoffenberg and various others entered into a conspiracy to operate a "Ponzi" scheme;

(2) Sorkin, having become aware of this conspiracy, willfully and knowingly joined it for the purpose of furthering its unlawful objectives;

(3) In order to further such unlawful objectives, Sorkin knowingly and willfully violated section 10(b) and Rule 10b–5 by drafting an offer of rescission in such a way as to deceive its recipients as to the value of the securities to which it related;

(4) Having so done, until February 1993 when the conspiracy collapsed Sorkin knowingly and willfully maintained his membership therein and performed various overt acts in furtherance of its unlawful objectives;

(5) During that period, the conspirators—in furtherance of such unlawful objectives—issued five misleading offerings for a total of $245 Million. Although it is not

---

**3.** The official transcript does not name the Justices asking questions. We have identified Justices Kennedy and Scalia from the context of the argument. An Appendix to this opinion sets forth the parts of the transcript which we deem necessary to put the quotations in context. The words quoted in the foregoing two paragraphs are identified in the Appendix by italics. Complete copies of the official transcript are being delivered to counsel. Should the Court of Appeals grant leave to appeal, three copies will be delivered to the Clerk for distribution to the appropriate Panel.

**4.** We could dismiss the entire Complaint with leave again to replead. That would be a waste of time. The crucial question clearly presented by this record is whether or not *Central Bank* precludes a conspiracy to violate section 10(b) and Rule 10b–5. Should that question be answered "yes" this litigation would be ended. If the answer is "no" and defendant continues to believe—as its present memorandum strongly suggests—that plaintiffs' factual allegations could not stand the light of day, it can either proceed by a motion for summary judgment or by pressing for an immediate trial.

**5.** *See* footnote 6, *infra*.

necessary to establish that Sorkin knew the exact terms of those offerings, it must be established by clear and convincing evidence that he was aware of their objectives and intended that they be issued;[6]

Any verdict rendered pursuant to such instructions would come within the scope of *Central Bank*'s observation that:

> "Any person or entity, *including a lawyer, accountant,* or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met. 511 U.S. at ——, 114 S.Ct. at 1455.

We are confident that the precedent set by such a verdict would not deter any attorney or accountant from giving legitimate professional advice. *cf. Central Bank*'s discussion at —— — ——, at 1453-54.

As predicted in our August 1 Opinion, we certify the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The requirement that "there be substantial ground for difference of opinion" is satisfied by the circumstance that the Second Circuit has not spoken on the question presented. As to the requirement that an appeal might "materially advance the ultimate termination of the litigation," should there be a reversal the litigation would terminate forthwith. On the other hand, an affirmance—which would authoritatively establish that liability, or lack of it, might ultimately be left to a finder of fact—could well make both parties eager to achieve a quick settlement.

*In summary,* we reaffirm the conclusion stated in our August 1 Opinion that *Central Bank* does not preclude the possibility of Rule 10b-5 conspiracy liability. We accordingly deny the motion to dismiss the Third Amended Complaint (except to the extent above indicated), and certify the question for appeal to the Court of Appeals.

**SO ORDERED.**

## *APPENDIX*

*Central Bank of Denver v. First Interstate Bank of Denver* (1994) 114 S.Ct. 1439.

United States Supreme Court Official Transcript, Oral Argument. Tuesday, November 30, 1993.[1]

QUESTION: *Under the allegations of the complaint taken in the light most favorably to the plaintiff, could there have been a cause of action or an allegation for liability as co—of the bank as co-conspirator?*

MR. TRAUTMAN (counsel for defendant-petitioner): Well, I suppose there could have been any allegation at the onset. *What they chose to do here, Your Honor, was not to sue us as a primary violator, but instead to sue us as an aider and abettor.*

QUESTION: Well, suppose they alleged that there was an agreement to hold up the appraisal, and then alleged that this was a conspiracy, would that be a separate cause of action?

MR. TRAUTMAN: In our view, a conspiracy would also be a separate cause of action.

QUESTION: Has it been treated as such in the writings, in the general law of torts?

MR. TRAUTMAN: In the general law of torts, conspiracy has been considered as part of the underlying tort, but here, and the problem we have with aiding and abetting, I think it's the same problem you have with conspiracy, is what the courts have tended to do is just to assume that these peripheral rights are there without any analysis as to

---

**6.** Ordinarily in a civil case conspiracy may be established by a preponderance of the evidence, and once membership has been shown to exist it is presumed—absent contrary evidence—to continue for the life of the conspiracy. In light of the special risks arising from the professional duties of lawyers and accountants and the importance as a matter of public policy that they be not inhibited from performing those duties, *see Central Bank*, at ——, 114 S.Ct. at 1454, the above noted variances from these rules seem appropriate. Such variances recognize that the "interests at stake" are "particularly important and more substantial than mere loss of money." *See, e.g., Santosky v. Kramer* (1982) 455 U.S. 745, 756, 102 S.Ct. 1388, 1396, 71 L.Ed.2d 599 (inner quotes omitted).

**1.** The following excerpts are from pages 11 to 21, and page 36 of the official transcript. The italicized portions are quotations cited in the body of our Opinion.

whether Congress really intended them to be there, and if, in fact, the key is—

QUESTION: We all agreed that Congress didn't provide any indicia of intent. You can't blame them for doing what we all concede wouldn't work.

MR. TRAUTMAN: That's correct.

QUESTION: The question, as Justice Scalia raised, is whether it really falls within a sort of rounding-out jurisprudence, and I mean, Justice Kennedy's point is that they could have been pursued on a conspiracy theory, and at least on traditional tort principles that would not have been regarded as a departure, and if that's so, why should this be regarded as a departure?

MR. TRAUTMAN: Well, I think the difference—there is a difference between aiding and abetting and conspiracy, and let me just focus on that for a moment. As you know, conspiracy is based upon an agreement, essentially that there has been a relationship set up based on an agreement.

What aiding and abetting is really premised on is additional conduct, additional conduct that the courts have struggled to define and have used words of substantial assistance and put all sorts of factors in front of that, such as, was the defendant benefited, and that sort of thing, and it has become a morass, as you look at the cases, as to what substantial assistance means, but that is separate conduct.

It is not a relationship, such as a conspiracy. It is not, as this Court said in Musick, an allegation of existing 10(b) liability, because it is additional conduct beyond manipulation or deception. If the fact—

QUESTION: Well, in a sense—in a sense, conspiracy requires an element that aiding and abetting doesn't, namely, an agreement, so in a sense, an aider and abettor is acting closer to the principal actor than is a conspirator.

MR. TRAUTMAN: That's correct, but there is a difference in terms of the actual—you see, my problem with what the lower courts have done is that they have focused on this substantial assistance issue, and they've lost

their eye on the ball, and the ball really here is, did my client engage in deceptive or manipulative conduct, and if they did, they could be sued as a primary violator. It so happens that the facts of this case, I think it's clear or undisputed, that we did not do anything that this Court has defined previously as being deceptive or manipulative, and so what you have out there essentially that's been applied—implied by the courts is a cause of action which allows a plaintiff to come in and sue a defendant because the defendant was around the transaction, was there, has deep pockets, and essentially to make allegations that they have benefited from the transaction, that they caused—they helped cause the transaction, if they had just acted differently this fraud wouldn't have occurred, but they did not engage in any deceptive or manipulative conduct.

QUESTION: But do you—

QUESTION: But why is that so clear? Why couldn't one say that deliberately delaying the time that this property would be reappraised was a manipulative practice?

MR. TRAUTMAN: Well, the reason you can't say that, Your Honor, is because manipulative practice was really focused on two concepts. One is misrepresentation, and second is either a failure to act or a failure to disclose in a context where you have a duty to do so. Neither of those two things are presented by this case.

QUESTION: Would you acknowledge that this horrible thing which you just described could happen if your client was sued for conspiracy to violate 10(b)?

MR. TRAUTMAN: Well—

QUESTION: *What about a cause of action for conspiracy to violate 10(b)?* Would that exist?

MR. TRAUTMAN: Your Honor, obviously that is *not presented here.* We think that a conspiracy is different than aiding and abetting. It does not have the same dangers—

QUESTION: I know it's different, but will you first answer my question. Do you acknowledge that there is a private cause of action for conspiracy to violate 10(b)?

MR. TRAUTMAN: I don't believe that there—I don't think this Court has ruled as such.

QUESTION: Do you think that here should be?

MR. TRAUTMAN: No I don't.

QUESTION: For the same reason that—

MR. TRAUTMAN: Exactly.

QUESTION: —you have for your—

MR. TRAUTMAN: And my point is, though, that you don't need to reach that, and in trying to respond to Justice Kennedy, I do not think there is a distinction.

\* \* \* \* \* \*

QUESTION: May I ask you, counsel, if you would concede that recklessness is a sufficient mens rea to satisfy any scienter requirement for primary liability?

MR. TRAUTMAN: Well, Your Honor, we think that that question obviously is not raised here, does not have to be decided, but if in fact—

QUESTION: No, but would you answer the question?

MR. TRAUTMAN: If in fact—if in fact that question were presented, we think that the proper approach would be to look at the words of 10(b) and to say that you cannot have a reckless manipulation, you cannot have a reckless device, so I don't think it should. However, there may be cases that come before this Court where the Court would—

QUESTION: Have most of the courts of appeals held that recklessness is sufficient—

MR. TRAUTMAN: Yes.

QUESTION: —in the primary liability—

MR. TRAUTMAN: Yes, they have.

QUESTION: —the same?

MR. TRAUTMAN: They have.

QUESTION: I think all of them have, haven't they?

MR. TRAUTMAN: Yes.

QUESTION: Yes.

MR. TRAUTMAN: They all have, Your Honor. I think the point being that if you decide, however, that recklessness were sufficient for aiding and abetting, I think almost by necessity everybody will assume that it's good enough for a primary violation even though you may try to reserve the question.

By contrast, there is a principal basis—

QUESTION: We might approach it just the other way and say clearly its enough under primary—

MR. TRAUTMAN: Exactly.

QUESTION: —liability and why shouldn't it be enough if there's aiding and abetting?

\* \* \* \* \* \*

MR. GERSH [counsel for plaintiffs-respondents]: \* \* \* I would like to address briefly the recklessness point, very briefly, in the time that I have remaining. The recklessness issue has to be analyzed, first of all, in the same way, in the way that is faithful to the purpose of Congress in the 10b–5 action itself, and if you start with the common-law, recklessness also, as a matter of satisfying the scienter or the culpable state of mind requirement, has a history that goes back really into the 19th Century in the common-law of deceit that the Congress was looking at when they developed the 10b–5 action, and to this—

QUESTION: It may well for the principal offense, but does it for the allied offense of aiding and abetting? Does it for conspiracy, for example? Can you *become a coconspirator by being reckless?*

MR. GERSH: I'm not certain about conspiracy, but as to aiding—

QUESTION: I am. *I'm certain you cannot become a coconspirator by being very reckless. You have to have an agreement, the intent to make alliance with the other person,* and isn't it the same for aiding and abetting? You need the intent to aid and abet.