**Robert W. DINSMORE, on behalf of himself and all others similarly situated, Plaintiffs–Appellees,**

v.

**SQUADRON, ELLENOFF, PLESENT, SHEINFELD & SORKIN, Defendant–Appellant.**

**No. 202, Docket 97–7011.**

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1997.

Decided Jan. 28, 1998.

Anthony K. Lee, Lieff, Girard & Green, LLP, San Francisco, CA (Daniel C. Girard, Eric H. Gibbs, Girard & Green, LLP, on the brief), for Plaintiffs–Appellees.

Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel, New York City, for Defendant–Appellant.

Before McLAUGHLIN and CABRANES, Circuit Judges, and MURTHA,* District Judge.

_____

* The Honorable J. Garvan Murtha, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

JOSÉ A. CABRANES, Circuit Judge.

This interlocutory appeal under 28 U.S.C. § 1292(b) presents the question whether the Supreme Court's decision in *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), holding that there is no aiding and abetting cause of action in private civil suits brought under § 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)")[1] and Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"),[2] also precludes a cause of action for conspiracy. We hold that it does.

## I.

Because the district court decided the question before us on a motion to dismiss, we must accept as true the averments of fact in plaintiffs' complaint. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (holding that dismissal is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

This class action suit arises from a massive "Ponzi scheme" perpetrated by Towers Financial Corporation ("Towers") whereby Towers raised approximately $245 million through fraudulent offering memoranda and kept its failing enterprise afloat by using the principal payments of investors to make interest payments to other investors. Plaintiffs brought this action in the United States District Court for the Southern District of New York (Whitman Knapp, *Judge* ) on behalf of persons who purchased or reinvested in promissory notes issued by Towers between February 15, 1989 and February 9, 1993 (the "Class Period Notes"). This appeal concerns only one of many defendants named in plaintiffs' complaint[3]—the New York law firm of Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin ("Squadron Ellenoff"), which served as counsel to Towers and two of its executives during investigations by the Securities and Exchange Commission ("SEC") beginning in 1988. We briefly state here only those facts relevant to Squadron Ellenoff and the instant appeal, and assume familiarity with the Report and Recommendation of Magistrate Judge Andrew J. Peck, to whom the case had been referred by Judge Knapp, which extensively canvasses the background of this case. *In re Towers Fin. Corp. Noteholders Litig.*, Fed.Sec. L.Rep. (CCH) ¶ 98,905, 1995 WL 571888 (S.D.N.Y. Sept.20, 1995).

Prior to the sale of the Class Period Notes, Towers had offered and issued other notes to the public in 1986 (the "1986 Notes"). In 1988, the SEC discovered that the 1986

1. Section 10(b), 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact neces-

sary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

3. The other defendants include accountants, brokers, Towers' previous lawyers, an insurance company and a rating service, and Towers' principals. Towers and its subsidiaries are not named, apparently because they filed for bankruptcy in March 1993 and are protected by the automatic stay provision of the Bankruptcy Code. Towers' chairman pled guilty to criminal charges based on his role in the scheme, as well as a number of other criminal activities, and was sentenced principally to serve a term of imprisonment of 20 years and to pay restitution of over $475 million and a fine of $1 million. *United States v. Hoffenberg*, Nos. 94 Cr. 213 & 95 Cr. 321, 1997 WL 96563 (S.D.N.Y. Mar.5, 1997).

Notes had not been registered pursuant to § 5 of the Securities Act of 1933, but at that time the SEC was not aware of the fraudulent nature of Towers' enterprise. A consent decree subsequently entered into between Towers and the SEC required Towers to refrain from further violations of § 5 and to make an offer of rescission to the holders of the 1986 Notes. This offer of rescission was drafted by Squadron Ellenoff, which also represented Towers before the SEC during the SEC's investigation of Towers' failure to register its 1986 Notes, and in subsequent SEC investigations into Towers' fraudulent practices.

Plaintiffs allege that Squadron Ellenoff prolonged Towers' fraudulent scheme in essentially two ways—first, by allegedly making material misstatements and omissions to the SEC during its representation of Towers, and second, by drafting the offer of rescission to the 1986 Noteholders. The offer of rescission gave the 1986 Noteholders the choice of receiving back their investments plus simple interest or holding onto their notes until maturity at the higher rate of interest initially offered—the latter option being chosen by a vast majority of the 1986 Noteholders. The rescission offer did not, however, disclose the fraudulent nature of the underlying investments, despite Squadron Ellenoff's alleged awareness of this fraud. Although the rescission offer was not directed or communicated to the present class action plaintiffs, they assert that if Squadron Ellenoff had revealed what it allegedly knew about its client's business, more of the 1986 Noteholders would have reclaimed their investments, thereby putting an end to Towers' Ponzi scheme before the Class Period Notes were ever issued. Similarly, plaintiffs claim that in the absence of Squadron Ellenoff's alleged material misstatements and omissions before the SEC, Towers' scheme would have been exposed at an earlier time. Plaintiffs do not allege, however, that Squadron Ellenoff had any role in preparing or disseminating the offering materials for the Class Period Notes that plaintiffs purchased.

Plaintiffs' first Consolidated Amended Class Action Complaint charged Squadron Ellenoff with aiding and abetting Towers' securities fraud. Squadron Ellenoff moved to dismiss the complaint, but before the motion was decided the Supreme Court ruled in *Central Bank* that there is no aiding and abetting liability under § 10(b) and Rule 10b–5. 511 U.S. at 191–92, 114 S.Ct. at 1455. The district court therefore permitted plaintiffs to file a second amended complaint, in which plaintiffs characterized Squadron Ellenoff as a primary violator of § 10(b) and Rule 10b–5, rather than an aider and abettor. Magistrate Judge Peck concluded in an exhaustive Report and Recommendation that the claim against Squadron Ellenoff should be dismissed for failure to satisfy several of the required elements of primary liability under § 10(b) and Rule 10b–5. *In re Towers Fin.*, Fed.Sec.L.Rep. (CCH) ¶ 98,905, 1995 WL 571888.

The district court, by an Opinion and Order dated August 1, 1996, adopted Magistrate Judge Peck's Report "in its entirety," but allowed plaintiffs to file a third amended complaint to plead a claim of conspiracy to violate § 10(b) and Rule 10b–5, a theory first raised by plaintiffs at oral argument on defendant's motion to dismiss. *In re Towers Fin.*, 936 F.Supp. 126, 127 (S.D.N.Y.1996) ("*Towers I*"). The court recognized that there was a question as to whether *Central Bank* precluded actions for conspiracy to violate § 10(b) and Rule 10b–5, and admitted that "with the exception of one district court which was effectively overruled by the Ninth Circuit Court of Appeals, every court which has considered this question has answered it in the affirmative, ruling that the Supreme Court's decision in *Central Bank*, which held that no private right of action exists for *aiding and abetting* a violation of Rule 10b–5, also prohibits actions for conspiracy to violate that rule." *Id.* at 129. Nonetheless, the court, drawing a distinction between the "reckless" conduct at issue in *Central Bank* and the "knowing and willful" conduct necessary to support a conspiracy, found these cases unpersuasive. The court therefore allowed plaintiffs to replead in order to advance a claim of conspiracy to violate § 10(b) and Rule 10b–5, and noted that "[s]hould we grant [an expected] motion to dismiss [the complaint as so amended], such decision would dispose of the entire controversy al-

leged in the complaint, and would be appealable as of right. Should we deny the motion, we would undoubtedly certify the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b)." *Id.* at 130.

After plaintiffs filed their third amended complaint alleging that Squadron Ellenoff conspired to violate § 10(b) and Rule 10b–5, the district court, by an Opinion and Order dated November 4, 1996, denied Squadron Ellenoff's motion to dismiss. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 945 F.Supp. 84 (S.D.N.Y.1996) (*"Towers II"*). The court merely referenced its earlier opinion (*Towers I*) concluding that *Central Bank* does not preclude conspiracy liability under § 10(b) and Rule 10b–5; it also cited selected portions of the official transcript of the *Central Bank* oral argument before the Supreme Court, which the court claimed offered additional support for its reading of *Central Bank. Id.* at 85–86, 87–89. The court certified the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), *id.* at 87, and we accepted the certification.

## II.

Plaintiffs contend that this appeal is not limited to the question whether *Central Bank* precludes a cause of action for conspiracy under § 10(b) and Rule 10b–5, but that it also presents the question whether the court, in *Towers I,* improperly dismissed plaintiffs' claim of primary liability on the part of Squadron Ellenoff. They claim that *Towers II,* from which this appeal was certified, incorporated *Towers I* by reference, and emphasize that "[a]s the text of § 1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 205, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996).

▮ While it is true that we may address any issue fairly included within the certified order, and are not limited to the particular question identified by the district

court, it is also the case that "[t]he court of appeals may not reach beyond the certified order to address other orders made in the case." *Id.* (citing *United States v. Stanley,* 483 U.S. 669, 677, 107 S.Ct. 3054, 3060, 97 L.Ed.2d 550 (1987)). It is clear that the sole issue raised by the certified order in this case—*Towers II*—is whether *Central Bank* precludes a cause of action for conspiracy to violate § 10(b) and Rule 10b–5. The district court in *Towers I* adopted in full Magistrate Judge Peck's analysis dismissing plaintiffs' claim of primary liability, and the only reason the court permitted plaintiffs to file a third amended complaint was to pursue the theory of conspiracy liability. As the court stated in *Towers II,* "[o]ur August 1 Opinion [*Towers I*] granted plaintiffs leave to file yet another complaint to test the validity of their counsel's assertion that defendant had participated in a conspiracy to violate section 10(b) and Rule 10b–5." 945 F.Supp. at 86. Contrary to plaintiffs' assertion on this appeal, *Towers II* did not "incorporate by reference" the court's rejection of primary liability in *Towers I,* but merely cited *Towers I* to refer to the court's expressed position on conspiracy liability in order to avoid restating it at length. *See id.* at 85. The court was clear that the issue of primary liability was not before it in *Towers II:* "The crucial question clearly presented by this record is whether or not *Central Bank* precludes a conspiracy to violate section 10(b) and Rule 10b–5. Should that question be answered 'yes' this litigation would be ended." *Id.* at 86 n. 4.

Inasmuch as plaintiffs' claim of conspiracy liability was the only issue addressed by *Towers II*—the order certified for interlocutory appeal—it is the only one over which we may exercise jurisdiction, and we are precluded from reaching the issue of primary liability disposed of in *Towers I.* We therefore limit our consideration to whether, in light of *Central Bank,* plaintiffs may advance a conspiracy cause of action under § 10(b) and Rule 10b–5, and express no opinion regarding the court's dismissal of plaintiffs' complaint in *Towers I* for failure to state a primary violation of the securities laws.[4]

---

4. Plaintiffs therefore remain free to appeal the issue of primary liability. Although it would

appear that claims remain outstanding against other defendants in this action, the district court

## III.

■ As the district court recognized, every court to have addressed the viability of a conspiracy cause of action under § 10(b) and Rule 10b–5 in the wake of *Central Bank* has agreed that *Central Bank* precludes such a cause of action.[5] *See, e.g., In re GlenFed, Inc., Sec. Litig.,* 60 F.3d 591, 592 (9th Cir. 1995); *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.,* 903 F.Supp. 479, 496–98 (S.D.N.Y. 1995); *In re MTC Elec. Techs. Shareholders Litig.,* 898 F.Supp. 974, 982 (E.D.N.Y.1995); *In re College Bound Consol. Litig.,* Nos. 93 Civ. 2348 & 94 Civ. 3033, 1995 WL 450486, at *8 (S.D.N.Y. July 31, 1995); *Van De Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 738 (D.Mass.1995); *Upton v. McKerrow,* 887 F.Supp. 1573, 1580 (N.D.Ga.1995); *In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 964 n. 8 (D.Md.1995); *Otto v. Variable Annuity Life Ins. Co.,* No. 82 Civ. 4762, 1995 WL 121519, at *1 (N.D.Ill. Mar. 17, 1995); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994), *aff'd,* 95 F.3d 922 (9th Cir.1996). Unlike the district court, we agree with these various courts that the Supreme Court's reasoning in *Central Bank* applies not only to aiding and abetting claims, but to conspiracy claims as well. Indeed, the dissenters in *Central Bank* recognized as much in their characterization of the majority's holding—a characterization with which the majority did not take issue. *See Central Bank,* 114 S.Ct. at 1460 n. 12 (Stevens, J., dissenting) ("The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for *conspiring* to violate § 10(b) and Rule 10b–5.").

The Court in *Central Bank* emphasized that "the statutory text controls the definition of conduct covered by § 10(b)," *id.* at 175, 114 S.Ct. at 1447, and was unwilling to imply a cause of action for aiding and abet-

ting where those terms were not used in the statute. The Court supported its unwillingness to read aiding and abetting into § 10(b) with its observation that aiding and abetting is expressly included as a basis for liability in other statutes, thus revealing that "Congress knew how to impose aiding and abetting liability when it chose to do so." *Id.* at 176, 114 S.Ct. at 1448 (citing Act of Mar. 4, 1909, § 332, ch. 321, 35 Stat. 1152, as amended, 18 U.S.C. § 2 (general criminal aiding and abetting statute); Packers and Stockyards Act of 1921, ch. 64, § 202, 42 Stat. 161, as amended, 7 U.S.C. § 192(g) (civil aiding and abetting provision)). Having concluded that the text of § 10(b) does not reach aiders and abettors, the Court held that "that conclusion resolves the case," finding it "inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text." *Central Bank,* 511 U.S. at 177, 114 S.Ct. at 1448. "As in earlier cases considering conduct prohibited by § 10(b)," the Court pronounced, "we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Id.* (citing *Santa Fe Indus. Inc. v. Green,* 430 U.S. 462, 473, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976)).

Even if the statute itself did not clearly resolve the case, the Court continued, it would have reached the same result. "When the text of § 10(b) does not resolve a particular issue, we attempt to infer how the 1934 Congress would have addressed the issue

retains discretion to enter a final judgment as to Squadron Ellenoff alone, pursuant to Fed. R.Civ.P. 54(b). *See Hogan v. Consolidated Rail Corp.,* 961 F.2d 1021, 1024–25 (2d Cir.1992) ("Rule 54(b) . . . empowers the district court to enter a final judgment as to fewer than all of the parties in an action, but 'only upon an express determination that there is no just reason for delay.' ").

5. As the district court pointed out, the one exception—*In re Medeva Sec. Litig.,* No. 93 Civ. 4376, 1994 WL 447141, at *3 (C.D.Cal. June 3, 1994), which declined to dismiss a conspiracy claim but did not explain why the claim was not precluded by *Central Bank*—was effectively overruled by the Ninth Circuit in *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir.1995).

had the 10b–5 action been included as an express provision in the 1934 Act." [6] *Central Bank*, 511 U.S. at 178, 114 S.Ct. at 1448 (internal quotation marks and citation omitted). To conduct such an inquiry, the Court looks to the other express causes of action in the 1934 Act for an indication of what the Seventy–Third Congress would likely have done had it enacted a private right of action under § 10(b). *Id.* Inasmuch as none of the express causes of action in the 1934 Act imposes liability on aiders and abettors, the Court inferred that Congress likely would not have attached such liability to § 10(b). *Id.* at 179, 114 S.Ct. at 1449.

The Court also rejected the argument that congressional intent to impose aiding and abetting liability could be implied from the common-law background against which the securities laws were enacted. Notably, the Court observed that "Congress did not overlook secondary liability when it created the private rights of action in the 1934 Act," *id.* at 184, 114 S.Ct. at 1451, citing the "controlling person" liability provided for by § 20 of the Securities Exchange Act. "The fact that Congress chose to impose some forms of secondary liability, but not others," the Court concluded, "indicates a deliberate congressional choice with which the courts should not interfere." *Id.* at 184, 114 S.Ct. at 1452.

The Court found further support for its conclusion that there is no aiding and abetting cause of action under § 10(b) and Rule 10b–5 in the fact that such a cause of action would allow liability to be imposed irrespective of any showing of reliance on the defendant's misstatements, a requirement that plaintiffs must satisfy in order to recover under Rule 10b–5. *Id.* at 178, 114 S.Ct. at 1449 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988)). "Allowing plaintiffs to circumvent the reliance requirement" by virtue of an aiding and abetting cause of action "would disregard the careful limits on 10b–5 recovery mandated by our earlier cases." *Id.* at 180, 114 S.Ct. at 1450.

As the many courts that have addressed the issue have recognized, the reasoning leading to the Supreme Court's rejection of aiding and abetting liability under § 10(b) and Rule 10b–5 also applies to conspiracy. Critically, as in the case of aiding and abetting, there is no mention of conspiracy in the text of § 10(b). Just as Congress clearly knew how to impose aiding and abetting liability when it chose to do so, thereby suggesting that its absence from § 10(b) should not be disregarded, the existence of statutes expressly providing for conspiracy liability, *see, e.g.*, Act of Mar. 4, 1909, ch. 321, § 37, 35 Stat. 1096, as amended, 18 U.S.C. § 371 (general criminal conspiracy statute); Packers and Stockyards Act of 1921, ch. 64, § 202, 42 Stat. 161, as amended, 7 U.S.C. §§ 192(f), (g) (civil conspiracy provisions), warrants the same conclusion here. Accordingly, implying a cause of action for conspiracy would be "inconsistent with settled methodology in § 10(b) cases" for precisely the same reason that the Supreme Court refused to imply a cause of action for aiding and abetting in *Central Bank*—it would "extend liability beyond the scope of conduct prohibited by the statutory text." 511 U.S. at 177, 114 S.Ct. at 1448. Moreover, as in the case of aiding and abetting, none of the express causes of action in the Securities Exchange Act mentions conspiracy, despite the fact that the Act imposed other forms of secondary liability—namely, upon controlling persons under § 20. Thus, the inference drawn by the Court that Congress likely would not have attached aiding and abetting liability to § 10(b) had it enacted a private cause of action should also be drawn with respect to conspiracy.

■ We emphasize that, while we decline to imply a cause of action for conspiracy to violate § 10(b) and Rule 10b–5, secondary actors who conspire to commit such violations will still be subject to liability so long as they independently satisfy the requirements for primary liability. As the Supreme Court stressed in *Central Bank:*

---

**6.** An implied private right of action under § 10(b) and Rule 10b–5 was first recognized in *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514 (E.D.Pa.1946) and was confirmed by the Supreme Court twenty-five years later in *Super-*

*intendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922–23, 44 L.Ed.2d 539 (1975).

The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

511 U.S. at 191, 114 S.Ct. at 1455. We simply hold that where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which *other parties* have committed a primary violation. As the Supreme Court has instructed, "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Id.* at 177–78, 114 S.Ct. at 1448.

The Supreme Court's analysis with respect to the one requirement for primary liability highlighted by the Court—the reliance requirement—constrains our decision here as well. Just as an aiding and abetting cause of action would have impermissibly permitted liability to be imposed in the absence of any showing of reliance, *see id.* at 178–82, 114 S.Ct. at 1449–50, a conspiracy cause of action would similarly render irrelevant the question whether plaintiffs relied on any misstatements or omissions by the defendant being sued. The instant case provides an apt ex-ample: the only misstatements or omissions alleged to have been made by Squadron Ellenoff were made to the 1986 Noteholders and the SEC, and plaintiffs—far from relying upon these communications in purchasing their securities—were entirely unaware of them. *See Towers I*, 936 F.Supp. at 127. This fact would be immaterial were we to recognize a conspiracy cause of action, and inasmuch as this "would disregard the careful limits on 10b–5 recovery mandated" by the Supreme Court, *Central Bank*, 511 U.S. at 180, 114 S.Ct. at 1450, we refuse to do so. Indeed, recognition of a cause of action for conspiracy would not only conflict with the reasoning of the Supreme Court in *Central Bank*, but would largely undo the effect of that decision itself, inasmuch as many aiding and abetting claims would simply be repleaded as conspiracy claims.[7] *See Kidder Peabody*, 903 F.Supp. at 498; *In re College Bound Consol. Litig.*, 1995 WL 450486, at *8; *Van de Velde*, 899 F.Supp. at 738.

The district court attempted to distinguish *Central Bank* by arguing that, whereas only reckless conduct was at issue in *Central Bank*, conspiracy requires intent. *See Towers I*, 936 F.Supp. at 129–30. We are unpersuaded by this argument.[8] The Supreme Court in *Central Bank* did not in any way rely on the level of scienter at issue, but on the fact that aiding and abetting was not included within the terms of the statute itself. The Court only mentioned "recklessness" twice: first, in reciting the elements of the § 10(b) aiding and abetting cause of action that the Tenth Circuit had applied in the decision being appealed, 511 U.S. at 166–68, 114 S.Ct. at 1443; and second, in responding

---

**7.** Although, as the district court urged, *see Towers I*, 936 F.Supp. at 130, there are differences between aiding and abetting and conspiracy, so that not all aiding and abetting claims could simply be repleaded as conspiracy claims, there is a substantial overlap between the two, and the facts of a particular case will commonly support liability under either of the two theories. *See Kidder Peabody*, 903 F.Supp. at 497–98; 9 Louis Loss & Joel Seligman, *Securities Regulation* 4488–90 (3d ed. 1992). Even if allowing a conspiracy cause of action under § 10(b) and Rule 10b–5 would not render *Central Bank* entirely meaningless, it would go a long way toward subverting not only the reasoning of *Central Bank*, but the practical impact of that decision.

**8.** We also refuse to place any weight upon inferences that might arguably be drawn from certain questions asked by the Supreme Court during oral argument in *Central Bank*, which the district court invoked to support its distinction between aiding and abetting and conspiracy liability. *See Towers II*, 945 F.Supp. at 85–86, 87–89. Questions are asked during oral argument for a variety of purposes, and are too unreliable an indicator of how any particular Justice might answer questions other than those ultimately decided by the Court, much less of how a majority of the Court would rule on such matters, to warrant drawing any conclusions from them.

to the suggestion in the SEC's *amicus curiae* brief that a civil aiding and abetting claim could be inferred from the federal criminal aiding and abetting statute (18 U.S.C. § 2), *see* 511 U.S. at 190–92, 114 S.Ct. at 1455. To this suggestion, the Court responded that "recklessness, not intentional wrongdoing, is the theory underlying the aiding and abetting allegations in the case before us." *Id.* This comment, however, did not reflect any distinction between recklessness and intent drawn by the Court for purposes of determining which causes of action are included within § 10(b), but merely highlighted one of the weaknesses in the SEC's argument that the existence of the criminal aiding and abetting statute necessarily supported an inference in favor of civil aiding and abetting liability under § 10(b).

Indeed, one of the questions on which the Supreme Court granted certiorari in *Central Bank* was whether recklessness satisfies the scienter requirement for aiding and abetting in the absence of a duty to disclose or act. *See* 61 U.S.L.W. 3813–14 (U.S. June 8, 1993). The test applied by the Tenth Circuit in *Central Bank,* under which recklessness was sufficient, *see* 969 F.2d 891, 903 (10th Cir. 1992), was at odds with the holdings of other circuits, which required intent, *see, e.g., Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990). Rather than resolving this issue, the Supreme Court held that aiding and abetting claims fall outside of the scope of § 10(b) altogether, without drawing any distinction between claims requiring intent and claims requiring only recklessness; under *Central Bank,* even aiding and abetting claims premised upon a showing of intent are barred. Accordingly, we reject any effort to distinguish *Central Bank* on the basis that conspiracy requires intent. The statutory text, not the level of scienter, was the determinative issue in *Central Bank,* and it controls here as well.

In sum, we join the many other courts that have addressed the question in holding that the effect of the Supreme Court's decision in *Central Bank* is to bar a cause of action for conspiracy to violate § 10(b) and Rule 10b–5. We express no opinion as to whether Squadron Ellenoff may be held liable as a primary violator of the securities laws—a question

that we have no jurisdiction to address on this interlocutory appeal.

### IV.

For the reasons stated above, the order of the district court in *Towers II* is reversed and the cause is remanded to the district court for further proceedings consistent with this opinion.