**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellant,**

v.

**U.S. ENVIRONMENTAL, INC.; Louis J. Sepe; Maria Sepe; Castle Securities Corp.; Michael T. Struder; Leslie S. Roth; and Dudley Mihran Freeland, Defendants,**

**John Romano, Defendant–Appellee.**

**Docket No. 97–6195.**

United States Court of Appeals, Second Circuit.

Argued April 23, 1998.

Decided Aug. 25, 1998.

Richard H. Walker, General Counsel (Jacob H. Stillman, Associate General Counsel, Lucinda O. McConathy, Assistant General Counsel, Christopher Paik, Senior Counsel, Paul Gonson, Solicitor, Securities and Exchange Commission, Washington, DC, on the brief), for Plaintiff–Appellant.

Ronald E. DePetris, DePetris & Bachrach, New York City, for Defendant–Appellee.

Before: WALKER, CALABRESI, Circuit Judges, and RESTANI, Judge.*

JOHN M. WALKER, Jr., Circuit Judge:

Plaintiff-appellant Securities and Exchange Commission ("SEC") appeals from the June 18, 1996 order of the United States District Court for the Southern District of New York (Peter K. Leisure, *District Judge*) dismissing, pursuant to Fed.R.Civ.P. 12(b)(6), the SEC's claim that defendant-appellee John Romano engaged in market manipulation in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (" § 10(b)"), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

We hold that Romano can be primarily liable under § 10(b) for following a stock promoter's directions to execute stock trades that Romano knew, or was reckless in not knowing, were manipulative, even if Romano did not share the promoter's specific overall purpose to manipulate the market for that stock. We therefore vacate the order of the district court and remand for further proceedings.

---

* The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

## Background

The following facts are taken exclusively from the SEC's amended complaint, which on a motion to dismiss at the pleading stage must be read in the light most favorable to the SEC.

Romano was employed as a trader and registered representative of defendant Castle Securities Corporation ("Castle"), a securities broker-dealer. Castle agreed to participate in a scheme whereby it and other defendants, including Romano, would manipulate upward the price of the stock of U.S. Environmental, Inc. ("USE"). At the direction of stock promoter Mark D'Onofrio ("D'Onofrio"), certain of the defendants or their nominees traded USE shares among themselves "for the purpose of creating the appearance of an actual market for trading USE shares" and thus raising USE's stock price. The complaint alleges that

Romano knowingly or recklessly participated in and furthered a market manipulation by:

(a) effecting offers, purchases, and sales of USE securities in return for promises of risk-free profit for engaging in such trades;

(b) effecting directed and controlled trades of USE securities;

(c) effecting "wash sales" and "matched orders"; and

(d) effecting trades involving undisclosed nominees.

Wash sales are "transactions involving no change in beneficial ownership" and matched orders are "orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 n. 25, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The complaint states further that

Romano agreed to advise D'Onofrio continuously as Castle received buy and sell orders for USE shares during each trading day. Romano agreed to execute trades as directed by D'Onofrio; and Romano also agreed to move, or adjust, the price Castle quoted for USE shares at D'Onofrio's direction. In return, D'Onofrio assured Romano that Castle would receive a profit on the transactions D'Onofrio directed.

In a typical manipulative transaction,

(a) D'Onofrio would direct a buy order from one of the ... brokerage accounts controlled by the D'Onofrio group [consisting of stock promoters Ramon N. D'Onofrio, Richard Kirschbaum, and D'Onofrio] to a market maker other than Castle;

(b) D'Onofrio would arrange in advance that the other market maker would contact Romano at Castle to buy the same number of shares;

(c) D'Onofrio would alert Romano that the other market maker would be calling Romano for stock;

(d) D'Onofrio, specifying number of shares and price, would instruct Romano to sell shares of USE to the other market maker; and

(e) D'Onofrio would supply Castle with the specified number of shares at a discount, enabling Romano to complete the transaction at a price at which both Castle and the other market maker received a risk-free profit on the transaction, as had been prearranged with Castle ... and Romano.

Romano, Castle, and the D'Onofrio group "intentionally engaged" in such "manipulative conduct ... between September 1989 and December 1989." As a result of these manipulative trades, the price of USE stock rose from $.05 to approximately $5.00 per share in this period. In June or early July 1990, Castle sold approximately 15,000 shares of USE stock to retail customers at $6.00 per share. Between September 1989 and August 1990, Castle made a profit of approximately $175,000 as a result of its market-making activity for USE.

The SEC then commenced the instant action, alleging that defendants violated various provisions of the securities laws in connection with their manipulation of USE stock and other aspects of an illegal scheme involving USE. Romano moved, pursuant to Fed R. Civ. P. 12(b)(6), to dismiss the SEC's manipulation claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. The district court granted the motion, *see SEC v. U.S. Envtl., Inc.*, 929 F.Supp. 168, 171 (S.D.N.Y.1996), on the sole ground that the SEC had failed to allege that Romano was a "primary violator[ ]," as required by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Rather, the district court held that Romano was alleged only to be an aider/abettor of securities violations, because Romano "follow[ed] directions from D'Onofrio in carrying out buy or sell orders" and "did not himself make wash sales, match orders, or use undisclosed nominees to artificially affect the price of securities." *U.S. Envtl.*, 929 F.Supp. at 170. The district court stated that "[e]ven if Romano knew that [the buyers and sellers] were D'Onofrio and undisclosed nominees of D'Onofrio, and hence knew that D'Onofrio was manipulating USE stock, he did not himself manipulate USE stock because he did not himself have a manipulative purpose." *Id.* In a subsequent order certifying for interlocutory appeal "[t]he issue of what level of scienter is required before a person trading in securities can be said to manipulate the securities," the district court noted that "where . . . manipulation is the basis of the claim, manipulative intent, and not mere knowledge or recklessness, is required before Rule 10b–5 is violated." *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, at 1–3 (S.D.N.Y. Aug. 6, 1996). On August 25, 1997, this court granted the SEC's motion for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

*Discussion*

In reviewing the district court's dismissal of the SEC's claim pursuant to Fed.R.Civ.P. 12(b)(6), we are "required to accept the material facts alleged in the complaint as true" and will vacate the dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Easton v. Sundram*, 947 F.2d 1011, 1014–1015 (2d Cir. 1991) (quotation marks omitted). Our review is *de novo. See Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996).

■ Romano's principal contention on appeal, with which the district court agreed, is that he cannot be primarily liable under § 10(b) for following a stock promoter's directions to execute trades that Romano knew, or was reckless in not knowing, were manipulative, where Romano did not share the promoter's ultimate "manipulative . . . purpose" to raise the stock price. We disagree.

Under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

.      .      .      .      .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.[1]

In *Central Bank*, the Supreme Court held that private civil liability under § 10(b) applies only to those who "engage in the manipulative or deceptive practice," but not to

---

1. Rule 10b–5, in turn, states that
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   (a) To employ any device, scheme, or artifice to defraud,

. . . . [or]
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

those "who aid and abet the violation." 511 U.S. at 167, 114 S.Ct. 1439. The Court observed that "[a]iding and abetting is a method by which courts create secondary liability in persons *other than* the violator [or violators] of the statute." *Id.* at 184, 114 S.Ct. 1439 (quotation marks omitted) (emphasis added). We have noted further that a primary violator is one who "participated in the fraudulent scheme" or other activity proscribed by the securities laws. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1471 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

Under the foregoing standards, we believe that, as alleged in the complaint, Romano falls well within the boundaries of primary liability. As an initial matter, we disagree with the district court's view that "[e]ven if Romano knew that [the buyers and sellers] were D'Onofrio and undisclosed nominees of D'Onofrio, and hence knew that D'Onofrio was manipulating USE stock, [Romano] did not himself manipulate USE stock because he did not himself have a manipulative purpose." *U.S. Envtl.,* 929 F.Supp. at 170. This view conflates the distinction drawn in *Central Bank* between primary violators and aiders/abettors based on conduct with the separate issue of scienter. We have noted that

> [t]he Supreme Court in *Central Bank* did not in any way rely on the level of scienter at issue, but on the fact that aiding and abetting was not included within the terms of [the Securities Exchange Act of 1934].
>
> .    .    .    .    .
>
> [The] Court held that aiding and abetting claims fall outside of the scope of § 10(b) altogether, without drawing any distinction between claims requiring intent and claims requiring only recklessness

or some other level of scienter. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 843–44 (2d Cir.1998). Thus, whether Romano was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them.

### A. *Scienter*

■ Of course, to establish Romano's liability under § 10(b), the complaint must as a threshold matter allege that Romano acted with sufficient scienter. *See Chill v. General Elec. Co.,* 101 F.3d 263, 266 (2d Cir.1996). The complaint's allegation that Romano "knowingly or recklessly participated in and furthered a market manipulation by ... effecting 'wash sales' and 'matched orders' " and that he "intentionally engaged" in "manipulative conduct" is plainly sufficient to satisfy that requirement. It is well-settled that knowledge of the proscribed activity is sufficient scienter under § 10(b). *See Ernst & Ernst,* 425 U.S. at 197, 96 S.Ct. 1375 ("[t]he words 'manipulative or deceptive' ... strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct"); *First Jersey Secs.,* 101 F.3d at 1467 ("knowing misconduct" sufficient to establish liability under securities fraud statutes); *SEC v. Lorin,* 76 F.3d 458, 460 (2d Cir.1996) (per curiam) (affirming liability against defendant who "knew of the manipulation agreement and knowingly participated in carrying it out"); *cf.* Restatement (Second) of Torts, § 8A (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). Therefore, the allegation that Romano executed trades that he knew were for a manipulative purpose sufficiently alleged scienter in a manner supporting § 10(b) liability.

■ Although we need not rely on this point, we also note that the complaint's claim that Romano recklessly participated in the manipulation also alleges sufficient scienter. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996) ("In order to establish scienter ..., [it is sufficient that] the plaintiffs ... identify circumstances indicating conscious or reckless behavior by the defendants"); *Chill,* 101 F.3d at 267; *see also* Louis Loss & Joel Seligman, Securities Regulation, Vol. VIII, ch.9, § B(6), at 3665–67 n. 521 (3d ed.1991) (noting holdings of eleven circuits that recklessness can constitute sufficient scienter); *cf. Ernst & Ernst,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375 (leaving open question whether "reckless behavior" is sufficient to establish § 10(b) liability).

**111**

Moreover, as long as Romano, with scienter, effected the manipulative buy and sell orders, Romano's personal motivation for manipulating the market is irrelevant in determining whether he violated § 10(b). Even if Romano were motivated by a desire to obtain compensation rather than by a desire to change USE's market price, as D'Onofrio was, Romano is liable under § 10(b) if, with scienter, he effected the manipulative trades.

### B. *Primary Violator or Aider and Abettor*

It is plain to us that the complaint alleged Romano to be a primary violator. Romano "participated in the fraudulent scheme," *First Jersey Secs.*, 101 F.3d at 1471, *i.e.*, the manipulation of USE's stock, by effecting the very buy and sell orders that artificially manipulated USE's stock price upward. Indeed, if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would remain liable after *Central Bank*.

In *Central Bank*, holders of defaulted bonds sued the issuer and others alleging primary liability under Rule 10b–5 and also sued the indenture trustee on the theory that the trustee aided and abetted the other defendants' violations by recklessly ignoring its oversight duties. The Supreme Court held that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act," 511 U.S. at 177, 114 S.Ct. 1439, and it dismissed the claim against the trustee, who had done neither. Similarly, *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997), involved an accounting firm that allegedly aided and abetted a fraudulent omission by "preparing [ ] financial projections that were later included in the principal defendants' offering memoranda," which in turn failed to disclose that one of the principals was a convicted felon. *Id.* at 721. We held in *Shapiro* that the accounting firm was not primarily liable, because "there exist[ed] no allegation that [its] projections misrepresented any financial fact" and the accounting firm in that case had no legal duty to disclose the information omitted from the offering memoranda. *Id.* at 721–22.

Romano, in contrast, did not simply fail to disclose information when there was no duty to do so, as in *Shapiro*, or fail to prevent another party from engaging in a fraudulent act, as in *Central Bank*, when there existed no duty to prevent such. Rather, Romano himself "commi[tted] a manipulative act," *Central Bank*, 511 U.S. at 177, 114 S.Ct. 1439, by effecting the very buy and sell orders that manipulated USE's stock upward.

Finally, it is of no relevance that D'Onofrio, not Romano, masterminded the USE stock manipulation and that D'Onofrio's group "directed" Romano to effect the illegal trades.

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device ... may be liable as a primary violator under 10b–5.... In any complex securities fraud, moreover, there are likely to be multiple violators....

*Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, Romano is a primary violator despite the fact that someone else directed the market manipulation scheme. The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities laws. In sum, the complaint alleges that Romano is primarily liable under § 10(b) and Rule 10b–5 for the manipulation of USE stock.

Finally, in concluding, we make a few observations. First, in granting Romano's motion to dismiss, the district court dismissed the amended complaint's "third claim for relief—that Romano violated § 10(b) ... and Rule 10b–5." *U.S. Envtl.*, 929 F.Supp. at 171. Although the amended complaint's third claim was brought under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ("§ 17(a)"), as well as under § 10(b) and Rule 10b–5, neither the district court's opinion nor its certification order mention § 17(a). We also note that neither the SEC nor Romano has addressed § 17(a) on appeal. We conclude, therefore, that the dis-

trict court did not dismiss the SEC's third claim under § 17(a), and we do not address § 17(a) in this opinion.

■ Second, we note that, although Romano suggests that the complaint fails to allege Romano's fraud with particularity as required by Fed.R.Civ.P. 9(b), *see* Appellee's Br. at 6–7, the district court explicitly declined to rule upon that issue, *see U.S. Envtl.,* 929 F.Supp. at 171, and did not certify that issue for appeal. We therefore are without jurisdiction to consider the point.

Third and last, we note that The Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67 ("Reform Act"), enacted after *Central Bank,* provides that, in SEC actions, "any person that knowingly provides substantial assistance to another person in violation of a provision of [15 U.S.C. Chapter 2B, which includes § 10(b) ], or of any rule or regulation issued under this chapter [including Rule 10b–5], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(f). Thus, unlike private plaintiffs, the SEC now has authority to assert aiding and abetting claims under § 10(b). *See id.; SEC v. Fehn,* 97 F.3d 1276, 1283 (9th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 59, 139 L.Ed.2d 22 (1997). It remains unclear, however, whether the SEC could bring aiding/abetting claims in cases based on conduct occurring prior to the enactment of the Reform Act. *See id.* at 1286–87 (applying Reform Act retroactively under particular circumstances of that case). Because the SEC did not make this argument before the district court or on appeal, however, we do not address this alternate ground for vacating the district court's dismissal. *See* Fed. R.App. P. 28(a)(6); *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) (arguments not addressed in appellate brief are waived).

### Conclusion

For the reasons set forth above, the order of the district court is vacated and remanded. Each party shall bear its own costs.